**LESSNER PLUMBING & HEATING CO., Inc., v. UNITED STATES.**

District Court, S. D. New York.

June 25, 1945.

Samuel Dimson, of New York City, for plaintiff.

James B. M. McNally, U. S. Atty., for the Southern District of New York, and Stanley H. Lowell, Asst. U. S. Atty., both of New York City, for defendant.

NEVIN, District Judge (sitting by designation).

In this action, plaintiff seeks to recover from defendant what it claims is fair and just compensation due it in accordance with the Act of October 16, 1941, 55 Stat. 742, as amended, 50 U.S.C.A.Appendix, § 721, for certain copper and copper-base alloy products requisitioned by defendant for war purposes.

Plaintiff, Lessner Plumbing & Heating Company, Inc., is a New York corporation, having its principal place of business in the Borough of Bronx, in the City and State of New York. It is engaged in the plumbing and heating contracting business, including the installation, repairing and improvement of plumbing and heating in buildings and other structures.

When plumbing is installed by plaintiff, it supplies both the materials and labor necessary to make such installations. The usual practice of the trade is for the contractor, such as plaintiff, to purchase materials from jobbers, who are wholesale distributors. Brass pipe is very frequently used for piping installations.

Plaintiff filed its complaint herein on November 18, 1943. Defendant filed its answer on April 8, 1944. No issue is raised respecting the power of the Government to requisition the material in question, nor as to the manner or method of requisition. Neither is there any issue as to the legality of the priority regulations promulgated by the War Production Board.

The sole issue is whether in arriving at the amount which constitutes just compensation due from defendant to plaintiff, the market value of the property requisitioned was the scrap price, the Government's Copper Recovery Program price, or some other figure.

Plaintiff contends that the amount of such compensation should be $709.97. Defendant, by its answer, claims that the amount of such compensation should be $131.76. It is admitted that plaintiff has received the sum of $131.11 on account, and that this sum should be deducted from any amount found to be due plaintiff. Plaintiff does not seek consequential damages.

On April 29, 1944—being prior to the trial which started on September 21, 1944 —defendant filed a written "Offer of Judgment" stating that it "hereby offers to allow judgment to be taken against it in the sum of sixty-five (65) cents with interest and costs, according to law."

Trial by jury having been waived by agreement of the parties, the cause was heard by the Court. Evidence was offered by way both of oral testimony and documentary proofs—now exhibits herein. Subsequently, illuminating briefs were filed wherein the facts are reviewed and authorities cited.

However, in view of its findings and conclusions herewith, the Court is of the opinion that no useful purpose would be served in here entering upon a detailed discussion of either the facts or the law.

Upon a consideration of the whole of the record, the briefs and arguments of counsel and the applicable law, the Court has arrived at the following:

### Findings of Fact.

1. Plaintiff is a domestic corporation duly organized and existing under the Laws of the State of New York. It has its principal office for the transaction of business in the Borough of Bronx, City and State of New York, which is within this district.

2. This Court has jurisdiction of the parties and of the subject matter in this action by reason of the provisions of the Act of October 16, 1941, 55 Stat. 742, as amended.

3. At all times herein mentioned, plaintiff was engaged in the plumbing business, in the course of which it regularly bought and installed brass pipe, a copper base alloy product. Plaintiff did not sell brass pipe except as part of a plumbing installation made by it.

4. On December 23, 1942, acting pursuant to the powers conferred by the Act of October 16, 1941, 55 Stat. 742, as amended, the United States, acting through Metals Reserve Company as its agent, requisitioned and took from plaintiff 1,577.7 pounds of brass pipe, consisting of 336.3 pounds of red brass pipe and 1,241.4 pounds of yellow brass pipe.

5. On June 12, 1943, the War Production Board made Award of Compensation to plaintiff for the material so requisitioned. This award was in the amount of $262.21.

6. Plaintiff was unwilling to accept such award as the fair value of the material requisitioned, and, in accordance with the provisions of the Act of October 16, 1941,

there was paid to plaintiff one-half of the amount of such award, or $131.11.

7. The entry of the United States into the war and the fulfilling of military requirements had resulted in a critical shortage of copper. To conserve the existing supplies of this material, conservation and limitation orders were issued by the War Production Board and its predecessor, the Office of Production Management. These conservation and limitation orders restricted the use and sale of copper and copper base alloy materials.

8. Conservation Order M-9-c-4, which was issued by the War Production Board on July 22, 1942, and amended on October 27, 1942, restricted the use of all copper base alloy building materials, including brass pipe.

9. By virtue of Conservation Order M-9-c-4, between July 22, 1942, and October 26, 1942, plaintiff was able to sell and install brass pipe in maximum quantities of 25 pounds, but only to replace brass pipe in repairs on existing plumbing installations.

10. After October 27, 1942, by virtue of Conservation Order M-9-c-4, plaintiff could sell brass pipe only as scrap.

11. After October 27, 1942, by virtue of Compensation Order M-9-c-4, plaintiff was not able to sell or dispose of any copper or copper base alloy products for repair or any other use in a building or structure.

12. In February, 1942, the War Production Board established the Copper Recovery Program. This program was established for the purpose of moving idle and excess inventories of copper and copper base alloy into essential war production. The program was designed to move all such idle and excess inventories, including those created by conservation and limitation orders which had prohibited the use of the material for the purpose for which it was originally acquired.

13. A price schedule was established under the Copper Recovery Program, setting forth prices at which such idle and excess inventories would be purchased.

14. All material purchased by the Copper Recovery Corporation under the Copper Recovery Program was used only as scrap for remelt.

15. Under the Copper Recovery Program, every effort was made initially to find a purchaser with a permitted use who would be able to use "as is" the idle and excess inventories reported under the program.

16. On or about August 3, 1942, in accordance with the provisions of the Copper Recovery Program, plaintiff reported its inventory of idle and excess copper base alloy material on Form W. P. B. 843. The material shown on this report was substantially the same material which was subsequently requisitioned.

17. From the date of filing of plaintiff's report on Form W. P. B. 843, to December 23, 1942, the War Production Board attempted to find a person with a permitted use for such material who would purchase plaintiff's holding of brass pipe for "as is" use. These efforts by the War Production Board were diligently prosecuted.

18. It was the experience under the Copper Recovery Program that material for which "as is" use could be found would be moved within 30 days or less. There was such a pressing demand for copper at the time, and the lists of material available through Copper Recovery Corporation were so widely distributed, that it was considered that material which did not move during this period of time was not usable in the war effort.

19. Although diligent efforts were made, no market could be found for the plaintiff's material over a period exceeding 4 months.

20. Plaintiff reported to the War Production Board, on several occasions, that it was attempting to find a person who could purchase its holding of brass pipe for "as is" use.

21. Plaintiff's holding of brass pipe consisted of pipe of eight different sizes and chemical compositions. In some cases, it held only one 12-foot length of a given size of pipe, and its total inventory gave the appearance of being remainders left over from various installations which it had made. In no case did plaintiff hold enough of any single size and composition of pipe to enable it to be used for a complete job.

22. The permitted users of copper base alloy products were only interested in buying substantial quantities and did not consider plaintiff's holding a marketable quantity.

23. Almost 15,000 holders of idle and excess inventories of copper and copper base alloy products sold their holdings voluntarily to Copper Recovery Corpora-

tion at the prices established under the Copper Recovery Program. The aggregate weight of these holdings exceeded 105,000,000 tons.

24. Over 13,000,000 pounds of copper and copper base alloy pipe and tubing were sold voluntarily to Copper Recovery Corporation at the prices established under the Copper Recovery Program.

25. Maximum Price Regulation No. 12, issued by the Office of Price Administration, established ceiling prices for sales of material of the type held by plaintiff to brass mills for remelt purposes. The prices so established were 8⅝ cents per pound for yellow brass and 9⅓ cents for red brass.

26. The price established under the Copper Recovery Program for brass pipe of the sizes and grades held by plaintiff was 17 cents a pound.

27. Only two markets for plaintiff's material were available on December 23, 1942. One of these was the scrap market, in which the price was limited by Maximum Price Regulation No. 12, and the other was the market established under the Copper Recovery Program.

28. The market value of plaintiff's holding, at the price established under the Copper Recovery Program, was $262.21.

### Conclusions of Law.

1. Plaintiff is entitled to just compensation for the material requisitioned from it. Just compensation for such material is its market value at the time of the requisition, December 23, 1942.

2. Market value is to be determined by the use to which the property might be put under all the circumstances and conditions prevailing at the time of taking.

3. Conservation Order M–9–c–4, which was issued by the War Production Board on July 22, 1942, and amended on October 27, 1942, restricted the use of all copper base alloy building materials, including brass pipe.

4. By virtue of Conservation Order M–9–c–4, between July 22, 1942, and October 26, 1942, plaintiff was able to sell and install brass pipe in maximum quantities of 25 pounds, and then only to replace brass pipe in repairs on existing plumbing installation.

5. After October 27, 1942, by virtue of Conservation Order M–9–c–4, plaintiff could sell brass pipe only as scrap.

6. After October 27, 1942, by virtue of Compensation Order M–9–c–4, plaintiff was not able to sell or dispose of any copper or copper base alloy products for repair or any other use in a building or structure.

7. The only markets which were available to plaintiff on December 23, 1942, for the material requisitioned from it were either the scrap market or the market established under the Copper Recovery Program.

8. The number and volume of sales voluntarily made at the prices established under the Copper Recovery Program establish that this was a market for idle and excess inventories of copper and copper base alloy material, and that the prices established under such program represented the fair market value of such materials.

9. The fair market value to be considered and applied in the instant case is the price established under the Copper Recovery Program.

10. Allowing credit for the sum of $131.11 heretofore paid to plaintiff by the War Production Board, plaintiff is entitled to judgment in the sum of $131.10.

Judgment accordingly.