## LOUISVILLE FLYING SERVICE, Inc., v. UNITED STATES (two cases).

### Nos. 754, 755.

District Court, W. D. Kentucky,
Louisville Division.

July 20, 1945.

E. J. Wells, of Louisville, Ky., for plaintiff.

Marvin C. Taylor, Atty., Dept. of Justice, and Rawlings Ragland, Acting Head, Claims Division, both of Washington, D. C., and David C. Walls, U. S. Atty., of Louisville, Ky., for defendant.

MILLER, District Judge.

These two actions, which were heard together by the Court without a jury, were filed by the plaintiff Louisville Flying Service, Inc., under the Act of October 16, 1941, 55 Stat. 742, Section 721, 50 U.S.C.A.Appendix, to recover compensation for two Stinson Aircraft which were taken over by the United States of America on May 13, 1943 for use in its war program. The parties were unable to agree upon the amount of compensation to be paid, and that issue is the only one involved in these actions.

### Findings of Fact.

The plaintiff, Louisville Flying Service, Inc., is a Kentucky corporation with its principal office in Jefferson County, Kentucky. Prior to May 13, 1943 it had entered into a contract with the Department of Commerce Civil Aeronautics Corporation of Washington, D. C., to give flight instructions for the United States Army and was engaged in this work on that date. It owned among other assets one Stinson Aircraft, Model SR–9 B NC 17122, hereinafter referred to as plane No. 1, and one Stinson Aircraft model SR–9 CM NC 18435, hereinafter referred to as plane No. 2, both of which planes were being used by it in the course of instruction to students as required under its contract. On or about April 7, 1943 it was notified by the Defense Plant Corporation and the War Production Board that the two planes were needed for the defense of the United States, and that such need was immediate and impending and such as would not admit a delay or resort to any other source of supply. On May 13, 1943 the Defense Plant Corporation, acting under the authority of the Act of October 16, 1941 as amended and the Executive Orders issued thereunder, seized these planes

for the use of the United States. An appraisal of the two planes was made at that time on behalf of the Government by P. S. Bloom, district maintenance supervisor, which appraisal gave to plane No. 1 a fair market value of $9,076.41, and to plane No. 2 a fair market value of $10,248.31. The planes were immediately removed from the premises of the plaintiff and sent to Rochester, Minnesota, where they were used for pilot training. In accordance with the provisions of the Act the plaintiff on or about May 29, 1943 filed its proof of claim with the requisitioning branch of the War Production Board, Washington, D. C., claiming that the fair and just compensation of the planes was $9,076.41 for plane No. 1 and $10,248.31 for plane No. 2.

Under date of July 6, 1943 the plaintiff was notified by the Washington office of the War Production Board that the appraisal value of plane No. 1 had been reduced from $9,076.41 to $7,171.42, and that the appraisal value of plane No. 2 had been reduced from $10,248.31 to $8,568.86. On October 6, 1943 the plaintiff was advised by the Acting Chief of the Requisitioning Branch of the War Production Board that the appraisal value of plane No. 1 was further reduced to the value of $6,621.11, and that the appraisal value of plane No. 2 was further reduced to the value of $8,-115.57. The plaintiff notified the War Production Board that these appraisals of October 6, 1943 did not represent fair and just compensation for the property so seized, that it was not willing to accept said amounts as such compensation, but as provided by the Act it would accept 50% of such amount with the right to bring suit to determine the fair value of the planes so taken. Under date of January 18, 1944 the plaintiff was paid the sum of $3,310.56 for plane No. 1 and the sum of $4,057.79 for plane No. 2, being in each instance one-half of the last appraisal made by the War Production Board. These actions, with respect to plane No. 1 and plane No. 2, respectively, were thereafter instituted by the plaintiff, in which it claimed a fair market value of not less than $9,076.41 for plane No. 1 and a fair market value of not less than $10,248.31 for plane No. 2, subject to the credits for the amounts already received in each instance.

The war defense program of the Government included basic training of aviators for the Army and Navy which required the use of a large number of airplanes, many of which had to be obtained from private owners. The task of acquiring these necessary planes was assumed by the Civil Aeronautics Administration in conjunction with the War Production Board and the Defense Plant Corporation. The program contemplated the acquisition of the planes by voluntary purchase wherever possible and a resort to requisitioning under the Act of October 16, 1941 in those cases where the owners would not or could not sell their planes voluntarily. Because of the urgency of the training program the War Production Board on January 26, 1943 issued its General Limitation Order L-262 which provided that no single engine aircraft of 500 horse power or less should thereafter be sold except pursuant to specific authorization of the Director General for Operations. Under the authority of this Order representatives of the Army, Navy, War Production Board, Civil Aeronautics Administration and civilian owners worked out a formula for determining the fair market value of planes to be acquired. All clearances for sales thereafter were given on condition that the sale price would be determined by the application of the formula. The formula started the appraisal of the plane with the list price of the plane on October 1, 1941, although in many instances, including the purchase of the two planes herein involved, the purchaser obtained in a sale made prior to 1943 a dealer's discount of 20% or more. Extra equipment on the plane which was not included in the list price was appraised at its installed list price. Equipment which was added subsequent to the original purchase was classified as "special equipment" and was also appraised at its installed list price. The plane and extra equipment were depreciated from the date of manufacture to the date of appraisal. "Special Equipment" was depreciated from the date of its installation. The depreciated rate in all cases was 8% per annum. Good and customary flying practice required that airplane engines be completely overhauled at the end of each 500 hours of flying time. The formula set up brackets according to horsepower and adopted the known cost of overhauling within each bracket, and made a deduction from the appraisal figure of 1/500 of this amount for each hour of flying time since the last major overhauling. The formula also called for deduction for missing standard equipment included in the list price used in the appraisal, and the cost

of the materials and labor for repairs, if any, necessary to make the plane airworthy. The initial appraisal of the two planes in question was made by P. S. Bloom according to this formula. The plaintiff at the time knew the method being followed, participated in the appraisal to the extent of checking the correctness of the list of equipment, the dates of installation, and the date of the last major engine overhaul, and was given a copy of the appraisal on the appraisal form in use which showed how the formula was applied. No complaint was made as to the use of the formula or as to the amount of this field appraisal. The plaintiff declined to sell the planes voluntarily because it believed that it would have to include the full amount received in its tax return as a capital gain, but if the plane was requisitioned it would be permitted to retain the money in a special fund for the purchase of planes after the war. Field appraisals were subject to verification and to modification upward or downward upon a correct application of the formula by personnel of the Civil Aeronautics Administration, and, in cases of requisitioning, by personnel of the War Production Board, in Washington. A correct application of the formula in the present cases results in a price of $6,865.91 for plane No. 1 and $8,478.05 for plane No. 2. The two successive reductions from the initial field appraisal resulted from the incorrect application of the formula to the planes being appraised.

5,434 planes were acquired by the Government at prices fixed by application of the formula. All but 12 of these were voluntary transfers. Of the 12 which were requisitioned by the Government 10 of them were requisitioned because of title questions which made voluntary sales impossible. The remaining two planes are the ones involved in these cases. Nineteen Stinson SR–9 C airplanes of the same model as the two planes involved in this case were acquired under the program of voluntary transfer.

### Conclusions of Law.

The Act of October 16, 1941, Section 721, 50 U.S.C.A.Appendix, provides in substance that whenever the President, during the national emergency declared on May 27, 1941, determines that the use of any military equipment is needed for the defense of the United States and such need is immediate and impending and such as will not admit of delay or resort to any other source of supply, and all other means of obtaining the use of the property upon fair and reasonable terms have been exhausted, he is authorized to requisition such property for the defense of the United States upon the payment of fair and just compensation to be determined as therein provided, such determination to be made as of the time the property is requisitioned in accordance with the provision for just compensation in the Fifth Amendment to the Constitution of the United States. If the owner is unwilling to receive the compensation so determined by the President as full and complete compensation for such property he shall be paid 50% of such amount and shall be entitled to sue the United States in the District Court for an additional amount, which when added to the amount so paid to him, he considers to be fair and just compensation for such property. Jurisdiction in the Court to determine the remaining amount due the plaintiff for the seizure of the two planes in question is accordingly conferred by this Act.

 Priority and allocation powers of the broadest scope were granted to the President, with power of delegation, by the Second War Powers Act of March 27, 1942. Section 633, 50 U.S.C.A.Appendix. These powers were finally delegated to the War Production Board by successive Executive Orders. See Executive Orders 8629, 8875, 8942, 9024, 9040, and 9125. The statute and Executive Orders vested in the War Production Board the power and duty to formulate policies and programs relating to equipment needed for the war effort, and to issue such rules and regulations as were necessary. The adoption of the formula and its compulsory application to the sale of airplanes was a valid exercise of that power. O'Neal v. United States, 6 Cir., 140 F.2d 908; Shreveport Engraving Co. v. United States, 5 Cir., 143 F.2d 222; United States v. Randall, 2 Cir., 140 F.2d 70; See L. P. Steuart & Bro. v. Bowles, 322 U. S. 398, 64 S.Ct. 1097, 88 L.Ed. 1350.

 The fixing of prices and the imposition of controls in the public interest is not an unconstitutional exercise of power by Congress, and the resulting injury to property or loss of value does not give rise to a cause of action against the sovereign. Mulford v. Smith, 307 U.S. 38, 59 S.Ct. 648, 83 L.Ed. 1092; Sunshine Anthracite Coal Company v. Adkins, 310 U.S. 381, 60 S.Ct. 907, 84 L.Ed. 1263; National Broadcasting Co. v. United States, 319 U.S. 190,

942

63 S.Ct. 997, 87 L.Ed. 1344; Nortz v. United States, 294 U.S. 317, 55 S.Ct. 428, 79 L. Ed. 907, 95 A.L.R. 1346; Perry v. United States, 294 U.S. 330, 331, 55 S.Ct. 432, 79 L.Ed. 912, 95 A.L.R. 1335. Loss of value resulting from an exercise of war powers by Congress is not a taking of property by Congress for which compensation must be made. Bowles v. Willingham, 321 U.S. 503, 517, 518, 64 S.Ct. 641, 88 L.Ed. 892; Morrisdale Coal Co. v. United States, 259 U.S. 188, 42 S.Ct. 481, 66 L.Ed. 892; Omnia Commercial Co. v. United States, 261 U.S. 502, 43 S.Ct. 437, 67 L.Ed. 773. Accordingly, plaintiff's loss, if any, resulting from the War Production Board's Limitation Order L-262, became an existing fact upon the promulgation of the Order, which would fall upon the owner under the authorities above referred to. This loss of value would necessarily be reflected in any voluntary sale of the property by the owner while the order was in effect. The effect of the order became a market condition directly affecting market value at the time. Such a market value may exist even though the owner does not elect to sell. Such is the case in most condemnation suits, the owner declining to sell because he thinks that the price which the existing market would bring is less than the value placed by him upon his property. But if there is an existing established market value, even though the owner declines to sell at it, it becomes the yardstick in determining what the Government must pay if it decides to take the property through condemnation proceedings. The Government is not required to pay more than what the owner would receive if the owner voluntarily sold the property under conditions then existing. The time of the taking by the Government can not be controlled or determined by the wishes of the owner. The fact that the taking results in a loss to the owner is not at all synonymous with the fact that the owner has not received the fair market value of his property *at the time of the taking.* United States v. New River Collieries Co., 262 U.S. 341, 344, 43 S.Ct. 565, 67 L.Ed. 1014; Olson v. United States, 292 U.S. 246, 255, 54 S.Ct. 704, 78 L.Ed. 1236. Such loss, if any, suffered by the plaintiff is of the same general character as that suffered by hundreds of thousands of American citizens whose properties, businesses, physical welfare, and even lives have been caught, damaged and often destroyed in the whirlpools of a world wide war. It seems clear that market value, as established by the formula, actually existed following the promulgation of Order L-262. 5434 sales were made in a few months time. The final appraisal of the two planes in question by the War Production Board was in accordance with the market value so established and is the "just compensation" to which the plaintiff is entitled under the Act. United States v. Delano Park Homes, Inc., 2 Cir., 146 F.2d 473; Lessner Plumbing & Heating Co., Inc., v. United States, D.C., S.D.N.Y., 64 F.Supp. 931.

The plaintiff is entitled to judgment in action No. 754 in the sum of $6,865.91 subject to the credit of $3,310.56 paid on January 18, 1944, and in action No. 755 in the sum of $8,478.05 subject to the credit of $4,057.79 paid on January 18, 1944.