## L. P. STEUART & BRO., INC. *v.* BOWLES, PRICE ADMINISTRATOR, et al.

No. 793. Argued May 2, 1944.—Decided May 22, 1944.

*Mr. Renah F. Camalier,* with whom *Mr. Francis C. Brooke* was on the brief, for petitioner.

*Mr. Thomas I. Emerson,* with whom *Solicitor General Fahy* and *Mr. David London* were on the brief, for respondents.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

Sec. 2 (a) (2) of Title III of the Second War Powers Act (56 Stat. 178, 50 U. S. C. App. (Supp. III), § 633) provides in part:

"Whenever the President is satisfied that the fulfillment of requirements for the defense of the United States will result in a shortage in the supply of any material or of any facilities for defense or for private account or for export, the President may allocate such material or facilities in such manner, upon such conditions and to such extent as he shall deem necessary or appropriate in the public interest and to promote the national defense."

By § 2 (a) (8) of the Act the President is granted authority to exercise that power "through such department, agency, or officer of the Government as he may direct and in conformity with any rules or regulations which he may prescribe." That authority, so far as material here, was

delegated to the Office of Price Administration,[1] which promulgated Ration Order No. 11, effective October 22, 1942, providing for the rationing of fuel oil.[2] That order recited the now familiar facts concerning the then critical and acute shortage of fuel oil and other petroleum products in the eastern states due to the great war activity. It stated that it was "essential to guarantee the continued availability of adequate supplies of fuel oil for military and naval use and for industrial and agricultural operations" and that the "reduction of demand to the available supply is sought to be achieved largely by a curtailment of the use of fuel oil for heating premises and for hot water, virtually the only classes of uses which can be uniformly reduced without directly impeding the war effort."[3] The order inaugurated "a system of rationing control" deemed necessary in order "to provide for equitable distribution of fuel oil in the areas of shortage."[4] Fuel oil rations for heat and for hot water were provided. Machinery was established for the regulation of the flow of fuel oil from suppliers to consumers. Only a few of those regulations are relevant here. Transfers of fuel oil to consumers were allowed only in exchange for ration coupons.[5] A dealer obtaining fuel oil from his supplier was generally required to surrender ration coupons within five days after the transfer.[6] Dealers were required, with exceptions not material here, to keep records of sales to consumers showing their names and addresses, the date and amount of the

[1] Executive Order No. 9125, 7 Fed. Reg. 2719; War Production Board, Supplementary Directive 1–0, Oct. 16, 1942, 7 Fed. Reg. 8418.

[2] 7 Fed. Reg. 8480.

[3] *Id.*, p. 8480.

[4] *Id.*, p. 8480. Ration Order No. 11 initiated rationing of fuel oil in thirty eastern, southeastern, and midwestern states and in the District of Columbia.

[5] § 1394.5652.

[6] §§ 1394.5707, 1394.5708.

transfer, and the coupons detached.[7] Provision was also made for "suspension orders" as follows:[8]

"Any person who violates Ration Order No. 11 may, by administrative suspension order, be prohibited from receiving any transfers or deliveries of, or selling or using or otherwise disposing of, any fuel oil or other rationed product or facility. Such suspension order shall be issued for such period as in the judgment of the Administrator, or such person as he may designate for such purpose, is necessary or appropriate in the public interest and to promote the national security."

On December 31, 1943, a suspension order was issued against petitioner, a retail dealer in fuel oil in the District of Columbia. It was found that petitioner had obtained large quantities of fuel oil from its supplier without surrendering any ration coupons. It was found that petitioner had delivered many thousands of gallons of fuel oil to consumers without receiving ration coupons in exchange;[9] and that in some instances petitioner delivered fuel oil to consumers without receipt of valid ration coupons in exchange.[10] Petitioner was also found to have

---

[7] § 1394.5656.

[8] § 1394.5803. And see 8 Fed. Reg. 2720.

The Office of Price Administration conferred on its Hearing Commissioners and Hearing Administrator the function of issuing suspension orders. General Order 46, 8 Fed. Reg. 1771. It also adopted, Feb. 6, 1943, Procedural Regulation No. 4, which prescribed the procedure to be used in the issuance of rationing suspension orders. 8 Fed. Reg. 1744. And see 9 Fed. Reg. 2558 for the revision of this regulation, issued Mar. 6, 1944.

[9] Some 328,000 gallons according to OPA, around 181,000 gallons on petitioner's computation.

[10] The OPA Hearing Administrator found "The record is replete with proof that respondent did commit, with reference to transfers to consumers, practically every sort of violation known to the regulations—making deliveries for expired coupons, unmatured coupons, no coupons at all and making emergency deliveries in excess of the quantities permitted."

failed to keep the required records showing its transfers of fuel oil to consumers. The suspension order prohibited petitioner from receiving fuel oil for resale or transfer to any consumer for the period from January 15, 1944 to December 31, 1944, the date when the Second War Powers Act expires. The order provided, however, that if petitioner furnished the Office of Price Administration with a list of consumers to whom it had sold fuel oil from October 21, 1941, to October 21, 1942, and if it surrendered all void ration coupons in its possession, it might transfer fuel oil to any consumer to whom it had transferred fuel oil during the year subsequent to October 21, 1941 [11] and receive fuel oil sufficient for that purpose. The order finally provided that if the Petroleum Administrator for War [12] should certify that the fuel oil needs of the District of Columbia could not be met by the supplies and the facilities of other suppliers and dealers in the area and that it was therefore essential to the welfare of the community that the provisions of the suspension order be modified, the restrictions might be wholly or partly removed.[13] The suspension order was issued after notice and hearings as provided in the regulations which govern the procedure in such cases.[14]

The present suit was brought in the District Court for the District of Columbia to enjoin the enforcement of the suspension order. A temporary restraining order was issued. Respondents moved for summary judgment. That motion was granted and the complaint was dismissed. On the appeal that judgment was affirmed. 140 F. 2d 703. The case is here on a petition for a writ of certiorari

---

[11] Ration Order No. 11 became effective October 22, 1942.

[12] Established December 2, 1942, by Executive Order No. 9276. 7 Fed. Reg. 10091.

[13] The suspension order also provided for an accounting by petitioner of its fuel oil transactions since October 22, 1942.

[14] Procedural Regulation No. 4, *supra*, note 8.

which we granted because of the importance of the problem in the administration of the rationing regulations.

The sole question presented by this case is whether the power of the President under § 2 (a) (2) of Title III of the Second War Powers Act to "allocate" materials includes the power to issue suspension orders against retailers and to withhold rationed materials from them where it is established they have acquired and distributed the rationed materials in violation of the ration regulations.

We state the question that narrowly because of the posture of the case as it reaches us. The constitutional authority of Congress to authorize as a war emergency measure the allocation or rationing of materials is not challenged. No question of delegation of authority is present. It is assumed, on petitioner's concession, that the President has validly delegated to the Office of Price Administration whatever authority he has under § 2 (a) (2) of Title III of the Act. And no question is raised, like those involved in *Yakus* v. *United States,* 321 U. S. 414, and *Bowles* v. *Willingham,* 321 U. S. 503, concerning the authority of Congress to delegate to the President in this way the power to allocate materials. No contention is made that petitioner was deprived of fuel oil without a hearing and an opportunity to defend. Nor is it argued that, although the power to issue suspension orders exists, that power was abused in this instance, so as to give rise to judicial review, and the limits of the authority exceeded by the specific provisions of the order which is before us. And finally, no challenge is made of the findings which underlie this suspension order.[15]

The argument, rather, is that the authority to "allocate" materials does not include the power to issue suspension orders; and that no such power will be implied since sus-

---

[15] The Government has conceded that there may be judicial review of suspension orders.

pension orders are penalties to which persons will not be subjected unless the statute plainly imposes them. See *Tiffany* v. *National Bank,* 18 Wall. 409, 410; *Keppel* v. *Tiffin Savings Bank,* 197 U. S. 356, 362; *Wallace* v. *Cutten,* 298 U. S. 229, 237. In that connection it is pointed out that Congress provided criminal and civil sanctions for violations of Title III of the Act. By § 2 (a) (5) any person who wilfully violates those provisions of the Act or any rule, regulation or order promulgated thereunder is guilty of a misdemeanor and subject to fine and imprisonment. By § 2 (a) (6) federal courts have power, among others, to enjoin any violation of those provisions of the Act or any rule, regulation or order thereunder. It is therefore contended that when violations of regulations under the Act are used as the basis for withholding rationed materials from persons, sanctions for law enforcement are created by administrative fiat contrary to the Act in question and contrary to constitutional requirements.

We agree that it is for Congress to prescribe the penalties for the laws which it writes. It would transcend both the judicial and the administrative function to make additions to those which Congress has placed behind a statute. *United States* v. *Two Hundred Barrels of Whiskey,* 95 U. S. 571; *Campbell* v. *Galeno Chemical Co.,* 281 U. S. 599; *Wallace* v. *Cutten, supra.* Hence we would have no difficulty in agreeing with petitioner's contention if the issue were whether a suspension order could be used as a means of punishment of an offender. But that statement of the question is a distortion of the issue presented on this record.

The problem of the scarcity of materials is often acute and critical in a great war effort such as the present one. Whether the difficulty be transportation or production, there is apt to be an insufficient supply to meet essential civilian needs after military and industrial requirements

have been satisfied. Thus without rationing, the fuel tanks of a few would be full; the fuel tanks of many would be empty. Some localities would have plenty; communities less favorably situated would suffer. Allocation or rationing is designed to eliminate such inequalities and to treat all alike who are similarly situated. The burdens are thus shared equally and limited supplies are utilized for the benefit of the greatest number. But middlemen—wholesalers and retailers—bent on defying the rationing system could raise havoc with it. By disregarding quotas prescribed for each householder and by giving some more than the allotted share they would defeat the objectives of rationing and destroy any program of allocation. These middlemen are the chief if not the only conduits between the source of limited supplies and the consumers. From the viewpoint of a rationing system a middleman who distributes the product in violation and disregard of the prescribed quotas is an inefficient and wasteful conduit. If the needs of consumers are to be met and the consumer allocations are to be filled, prudence might well dictate the avoidance or discard of such inefficient and unreliable means of distribution of a scarce and vital commodity. Certainly we could not say that the President would lack the power under this Act to take away from a wasteful factory and route to an efficient one a precious supply of material needed for the manufacture of articles of war. That power of allocation or rationing might indeed be the only way of getting the right equipment to our armed forces in time. From the point of view of the factory owner from whom the materials were diverted the action would be harsh. He would be deprived of an expected profit. But in times of war the national interest cannot wait on individual claims to preference. The waging of war and the control of its attendant economic problems are urgent business. Yet if the President has the power to channel raw materials into the most efficient industrial

units and thus save scarce materials from wastage it is difficult to see why the same principle is not applicable to the distribution of fuel oil.

If petitioner established that he was eliminated as a dealer or that his quota was cut down for reasons not relevant to allocation or efficient distribution of fuel oil, quite different considerations would be presented. But we can make no such assumption here. The suspension order rests on findings of serious violations repeatedly made. These violations were obviously germane to the problem of allocation of fuel oil. For they indicated that a scarce and vital commodity was being distributed in an inefficient, inequitable and wasteful way. The character of the violations thus negatives the charge that the suspension order was designed to punish petitioner rather than to protect the distribution system and the interests of conservation. Moreover, there is the following finding in support of the limitation on the number of customers which petitioner may hereafter service:

"We have no way of knowing how many customers the respondent corporation can serve while at the same time faithfully observing the rationing regulations. But we do know from its clearly established violations from the very inception of fuel-oil rationing that the number it then served approached the upper limit of its capacity since the fact is clear that it did not (whether it would not or could not) thereafter both service this number and simultaneously comply with the rationing regulations. Additional customers, then, clearly impose a burden which the respondent cannot bear."

None of the findings is challenged here. Taken at their face value, as they must be, they refute the suggestion that the order was based on considerations not relevant to the problem of allocation. They sustain the conclusion that in restricting petitioner's quota the Office of Price Administration was doing no more than protecting a com-

munity against distribution which measured by rationing standards was inequitable, unfair, and inefficient. If the power to "allocate" did not embrace that power it would be feeble power indeed.

What we have said disposes of the argument that if petitioner has violated Ration Order No. 11 the only recourse of the Government is to proceed under § 2 (a) (5) or § 2 (a) (6) which provide criminal and civil sanctions. Those remedies are sanctions for the power to "allocate." They hardly subtract from that power. Yet they would be allowed to do just that if it were held that violations by middlemen of the ration orders and regulations could never be the basis of reallocation of fuel oil into more reliable channels of distribution.

It is finally pointed out that Congress has seldom used the licensing power [16] and that that power, when used, has been employed sparingly. Thus one of the sanctions of the Emergency Price Control Act of 1942 (56 Stat. 33, 50 U. S. C. App. (Supp. III) § 925) is the power to revoke licenses for violations of maximum prices or rents. § 205 (f). That power may be utilized only in judicial proceedings; and licenses may be suspended only for limited periods. § 205 (f) (2). That consideration would be germane to the present problem if Congress had implemented the allocation procedure with a licensing system. Then the question might arise whether revocation of the license rather than the reallocation of materials by administrative action was the appropriate procedure in case of violations. Congress, however, did not adopt the licensing system when it came to rationing. And the failure to do so is hardly a reason for saying that the power to "allocate" is less replete than a reading of the Act fairly permits.

*Affirmed.*

Mr. Justice Roberts dissents.

---

[16] See § 5 of the Act of August 10, 1917, 40 Stat. 276, 277.