**UNITED STATES v. RUSSELL–TAYLOR, Inc., et al.**

No. 28465.

District Court, E. D. Michigan, S. D.

Feb. 4, 1946.

John C. Lehr, U. S. Atty., of Detroit, Mich. (argument by Morris Zwerdling, Asst. U. S. Atty., of Detroit, Mich.), for the government.

Bodman, Longley, Bogle, Middleton & Armstrong, of Detroit, Mich. (argued by Henry C. Bogle, of Detroit, Mich.), for respondents.

KOSCINSKI, District Judge.

Respondents are charged in the information with violation of War Food Order 13, Amendment 2, restricting the sale or delivery of "filled cream" having a total content of all oil and fat, including milk fat, in excess of 19 per cent (9 F.R. 6145). By interposing a demurrer and motion to quash the information the respondents challenge the validity of this order.

This regulation was issued under authority of the Second War Powers Act of March 27, 1942, 56 Stat. 176, 50 U.S.C.A. Appendix, Title III, § 633, amending Sec. 1152, and pursuant to Executive Order 9280, 50 U.S.C.A.Appendix § 601 note (7 F.R. 10179), delegating authority to the Secretary of Agriculture "to assume full responsibility for and control over the Nation's food program."

The motions as filed also attack the constitutionality of the Second War Powers Act and validity of Executive Order 9280 issued by the President under authority of that statute. In the course of oral arguments on these motions in open court respondents conceded the constitutionality of both the statute and executive order in view of two recent decisions by the appellate court of this circuit, upholding the constitutionality of both. O'Neal v. United States, 6 Cir., 140 F.2d 908, and Varney v. Warchime, 6 Cir., 147 F.2d 238. Respondents recognize these decisions as binding on this court. This concession, it will be noted here, was made only for the purpose of deciding the pending motions and respondents reserved their arguments on the constitutionality of such act and order for the trial of this case on the merits.

There remains here for decision, then, the narrow question whether the War Food Administrator under the delegation of authority to him exceeded that authority in issuing Amendment 2 to War Food Order 13.

The information contains a recital of the several acts of Congress granting war powers to the President such as the Act of Congress of June 28, 1940, 54 Stat. 676, 50 U.S.C.A.Appendix § 1152 et seq., as amended by the Act of Congress of May 31, 1941, 55 Stat. 236, 50 U.S.C.A.Appendix, § 1152, the "National Defense Act," as amended by the "Second War Powers Act, 1942," as further amended and extended by Section 1501 of the Act of December 20, 1944, Public Law 509, 78th Congress, 50 U.S.C.A.Appendix § 633 et seq., providing, among other things, that "Whenever the President [of the United States] is satisfied that the fulfillment of requirements for the defense of the United States will result in a shortage in the supply of any material or of any facilities for defense or for private account or for export, the President may allocate such material or facilities in such manner, upon such conditions and to such extent as he shall deem necessary or appropriate in the public interest and to promote the national defense." The last mentioned Act further empowers the President to exer-

cise any of the hereinbefore mentioned powers, authority, or discretion through such department, agency, or officer of the government as he may direct and in conformity with any rules or regulations which he may prescribe.

The President, under the power to delegate the authority granted him, and as Commander-in-Chief of the Army and Navy, by Executive Order 9280 issued December 5, 1942, delegated to the Secretary. of Agriculture the powers, authority and discretion with reference to the control of the national food program and the assignment and allocation of food for direct and indirect military, other governmental, civilian, and foreign needs, including authority to the Secretary to redelegate any or all such powers, authority and discretion, and further by said Executive Order 9280 established the Food Distribution Administration of the Department of Agriculture, under the direction and supervision of a Director of Food Distribution to be appointed by the Secretary of Agriculture.

The information further states that on February 2, 1943, the Secretary of Agriculture, in accordance with the aforesaid authority, and to assure an adequate supply and efficient distribution of dairy products to meet war and essential civilian needs, issued Food Distribution Order 13 (8 F.R. 1479), since designated as War Food Order 13 (9 F.R. 4319), effective February 3, 1943, restricting the sale and delivery of cream having a milk fat content in excess of 19% to designated persons authorized to purchase and receive said products pursuant to the provisions of said order; that under powers and authority vested in him by the Act of Congress the President of the United States by Executive Order 9322 (8 F.R. 3807), as amended by Executive Order 9334, 50 U.S.C.A.Appendix § 601 note (8 F.R. 5423), established a War Food Administration within the Department of Agriculture and delegated to the War Food Administrator all the powers, duties and functions granted to the Secretary of Agriculture under the hereinbefore described Executive Order 9280.

War Food Order 13, as amended by Amendment 2, provided as follows:

1. (a)-6. " 'Filled Cream' means any milk, cream or skim milk, whether or not condensed, evaporated, concentrated, powdered, dried; or desiccated, to which there has been added, or with which there has been blended or compounded, any fat or oil other than milk fat, so that the resulting product is an imitation of cream or in semblance thereof, whether or not such resulting product contains any other ingredient."

2. (b)-3. "No person shall, after July 31, 1944, sell or deliver filled cream having a total content of all oil and fat, including milk fat, in excess of 19 per cent, but this shall not be construed to permit the manufacture, sale, or delivery of filled cream in violation of the Filled Milk Act (21 U.S.C. 1940 ed., 61—64 [21 U.S.C.A. §§ 61–64])."

Pursuant to the authority vested in him by War Food Order 13, as amended by Amendment 2, the Director of Distribution, War Food Administration, upon petition for relief from hardship filed by Russell-Taylor, Inc., the corporate defendant, did establish quotas and authorize the sale of "filled cream" by said defendant during the quota periods of August, September, October, November, December, 1944 · and January, 1945. That the quotas thereby established for each of the above named quota periods were fixed and determined to be 75% of all milk solids utilized by said corporation in the production of filled cream during the corresponding month of the year 1943.

The information charges that during the aforesaid quota periods the respondents did unlawfully, wilfully and knowingly sell and deliver to divers persons, under the trade name of "Devonshire Topping," filled cream having a total content of all oil and fat, including milk fat, in excess of 19% and in excess of the quota of milk solids allotted to said respondent as aforesaid, in violation of the Second War Powers Act, 1942. There are six counts in the information, each charging a similar violation during each month stated.

The grounds of the motion to quash include all the grounds of the demurrer and the additional ground that · corporate defendant's product, "Devonshire Topping," is not "filled cream" within the meaning of War Food Order 13 as amended by Amendment 2. The grounds of both motions, with the additional ground in the motion to quash noted above, are:

1. That War Food Order 13 and the amendments thereto are invalid as not being authorized by any act of Congress or by the provisions of Executive Order 9280.

2. That Amendment 2 to said War Food Order 13 is invalid as not being authorized

by act of Congress or by said Executive Order 9280; that it was arbitrary and capricious and not based upon any findings of facts.

3. That the establishment of quotas for the sale of corporate defendant's product, the violation of which quotas is charged in the information as being a violation of War Food Order 13, as amended by Amendment 2, and as being contrary to the Second War Powers Act, 1942, was not authorized by act of Congress or by said War Food Order 13, as amended by Amendment 2, and the alleged violation thereof is not contrary to such statute or to said order as amended.

4. That the quota restriction was not an allocation but an absolute prohibition of the sale of respondents' product.

5. That the word "material" as used in the Second War Powers Act, 1942, does not mean "food."

6. That this regulation violates the due-process clause of the Fifth Amendment to the Constitution of the United States.

War Food Order 13, as Amended.

War Food Order 13 was issued on February 2, 1943, effective February 3, 1943. The order was a re-issuance of Conservation Order M–259, as amended, issued by the War Production Board on November 25, 1942 (7 F.R. 9811; 7 F.R. 10329; 7 F. R. 10616), and revoked on March 26, 1943 (8 F.R. 3780). The Conservation Order published this finding:

"The fulfillment of requirements for the defense of the United States have created a shortage in the supply of milk and milk products for defense, for private account and for export, and the following order is deemed necessary and appropriate in the public interest and to promote the national defense."

War Food Order 13 as originally issued restricted to 19% the milk-fat content of cream which producers (processors) could deliver except to another producer. On August 26, 1943, Amendment 1 (8 F.R. 11835) to said order was issued, effective September 1, 1943. This amendment extended the restrictions on the sale of cream containing more than 19% butter fat to the sale of cream products and prohibited the sale or delivery, except to another handler, of cream or cream products to which had been added evaporated milk, condensed milk, dried whole milk, or dried skim milk. "Producer" was changed to "handler,"

meaning any person who engaged in the sale, distribution or transportation of milk, cream, or any other dairy product. Respondent corporation was a "handler" within the meaning and definition of that term.

Prohibitions on the sale of filled cream first appeared in Amendment 2 to War Food Order 13 (9 F.R. 6145) effective August 1, 1944. By Sec. 6 of Amendment 2, "filled cream" was defined as:

"Any milk, cream or skim milk, whether or not condensed, evaporated, concentrated, powdered, dried or desiccated, to which there has been blended or compounded any fat or oil other than milk fat, so that the resulting product is an imitation of cream or in semblance thereof, whether or not such resulting product contains any other ingredients."

This amendment prohibited the sale or delivery after July 31, 1944, of filled cream having a total content of all oil and fats, including milk fat, in excess of 19%. The prohibition on the sale of filled cream, a recognized luxury item, was an extension of the government's efforts to save milk solids for more essential war-time uses. All of the violations charged in the information occurred during the period that Amendment 2 was in effect.

War Food Order 13 at all times contained the provision whereby any person affected by the order, who considered that compliance therewith would work an exceptional hardship on him, could file a petition for relief from hardship with the Regional Director of the War Food Administration. The action taken by the Regional Director on the petition was reviewable before the Director of Distribution, whose action was deemed final.

Respondents' contention that their product was singled out for discrimination by the War Food Administrator is untenable. No such assumption can be made here for the purposes of these motions. As far back as November, 1942, the War Production Board had already found a shortage in the supply of milk and milk products and issued the first order restricting the uses of cream. Further restrictions were made under Food Distribution Order 13 issued on February 2, 1943 and under Amendment 1 of Food Distribution Order 13 issued August 26, 1943.

It is interesting to note the contents of a press release made by the War Food

Administrator under date of August 26, 1943, which reads, in part, as follows:

"Other actions taken in Amendment 1 to Food Distribution Order No. 13, effective September 1, include:

"(1) Extending the present restrictions on the sale of cream containing more than 19% butter fat to the sale of cream products. Under the original provision of the order the restrictions applied only to cream as defined by food and drug regulations. By adding a stabilizer to the cream and calling the product by a brand name, the handler could apparently escape the restriction of Food Distribution Order 13 and market a product containing more than the allowed percentage of butter fat. Amendment prevents this practice.

"(2) Restricting the sale of cream or any cream products to which evaporated, condensed, dry whole or dry skim milk has been added in order to conserve milk solids urgently needed for war purposes. At the present time some milk handlers are mixing these products with their cream to make it 'heavier'. (Food Distribution Administration, U. S. Department of Agriculture, Feb. 2, 1943.)"

The question now before the court for determination is whether the War Food Administrator abused the authority subdelegated to him under Executive Order 9280 in issuing War Food Order 13 as amended by Amendment 2.

■ It may be conceded, as contended by respondents, that neither the Secretary of Agriculture, the War Food Administrator, nor any other executive, department, agency or officer of the government would have the power to issue an order that did not conform to the purpose, intent and language, both of the Act of Congress and of the Presidential order relied upon as authority for the issuance of such executive order or administrative order. We must bear in mind, however, that such legislation and orders were enacted and issued during a national emergency and in time of war and necessarily had to be expressed in broad terms and generalities. In the interpretation of such legislation and orders issued pursuant thereto the court must not hunt for limitations nor scrutinize the wording with confining intent but should seek for the purpose and spirit of the enactment. Brown v. Bernstein, D.C., 49 F.Supp. 728.

In a proper appraisal of the rationale of the War Food Administrator's order, the reason for its issuance and promulgation must necessarily be inquired into.

The nation was at war. The Congress invested the President with extraordinary powers for the most effective prosecution of the war. Mobilization of the country's resources was in progress to win a swift and decisive victory in the greatest war in which this country was ever engaged. Grave decisions on which the Republic's existence depended had to be made quickly. Equitable distribution of materials, products and supplies had to be made. Use of many essential materials had to be restricted so as not to hamper the war effort. As a result, there were shortages for civilian use in supply of many materials, products and supplies, including food—and rationing was resorted to. Articles of food such as meats, cheese, sugar, butter, and all kinds of canned food were rationed because of an existing scarcity of these in the nation at large. The rationing program included restriction, conservation, and distribution. Insofar as food distribution throughout the country is concerned, the War Food Administrator found it necessary to allot, apportion or allocate the available supplies of food in the best interests of the nation as a whole, regardless of inconvenience or even hardship to any person or group.

■ It is argued that "material" as used in Sec. 2(a) (2) is not "food." Webster's New International Dictionary defines "food" as "(1) nutritive *material* * * *, and (2) nutriment in solid form, as opposed to drink, which may also contain more or less nourishing *material*." There is additional authority for the proposition that a broad and comprehensive interpretation of the word "material" may under various circumstances be translated to mean "food". Brogan v. National Surety Co., 246 U.S. 257, 38 S.Ct. 250, 62 L.Ed. 703, L.R.A. 1918D, 776; American Surety Co. v. Dick Co., 8 Cir., 23 F.2d 464; United States v. Beit Bros., D.C., 50 F.Supp. 590; National Surety Co. v. Arizona Grocery Co., 32 Ariz. 399, 259 P. 404; United States v. Baur, D.C., 60 F.Supp. 162.

War Food Order 13, Amendment 2, Par. (4), defines "cream" in part to include light cream, coffee cream, table cream, whipping cream, plastic cream, sour cream, serated cream, and any other cream by whatever name known. And under Par. (5) "Cream products" are defined as "cream to which there has been added, or which has been

blended with, a culture, stabilizer, or like agent or ingredient; or with sugar, salt, condiment, spices, flavoring, or similar ingredients; whether or not the resulting product is pasteurized, homogenized, or sterilized."

■ It is common knowledge that defendants' product "Devonshire Topping" was used by housewives, hotels, and restaurants as a substitute for whipping cream. When restrictions on the use of cream were first imposed by the War Production Board and later by the War Food Administrator, some dealers or handlers of milk and its products resorted to making a product in imitation or in semblance of or as a substitute for whipping cream in which a large amount of milk fat and milk solids were utilized. Defendants' product, "Devonshire Topping," was one of these concoctions. In order to conserve milk solids for more essential war uses, the War Food Administrator issued Amendment 2 to War Food Order 13 restricting still further use of milk solids in the production of substitutes for whipping cream. Such whipping cream was and is a luxury item as used with other foods. Any compound of product made in imitation or semblance of whipping cream is likewise a luxury item and classed as an unessential in food consumption. The War Food Administrator defined these substitutes for whipping cream as "filled cream." Inasmuch as such products as "Devonshire Topping" were used as a substitute for whipping cream, this was a "cream product" as defined in Amendment 1 to War Food Order 13, issued August 26, 1943, and in Par. (5) of Amendment 2 issued June 2, 1944.

In examining the charge here made by respondents that the War Food Administrator abused his authority as delegated to him under Executive Order 9280, it is necessary to consult certain portions of this order. Par. 10 of Executive Order 9280 defines the term "food" in the following language:

"10. As used herein, the term 'food' shall mean all commodities and products, simple, mixed, or compound, or complements to such commodities or products that are or may be eaten or drunk by either humans or animals, irrespective of other uses to which such commodities or products may be put, and at all stages of processing from the raw commodity to the product thereof in a vendable form for immediate human or animal consumption, but exclusive of such commodities and products as the Secretary shall determine. For the purposes of this Executive Order, the term 'food' shall also include all starches, sugars, vegetable and animal fats and oils, cotton, tobacco, wool, hemp, flax fiber, and such other agricultural commodities and products as the President may designate."

In other words, the War Food Administrator was given authority by Executive Order 9280 to ration, restrict, allot, or allocate, not only all the food items described in the foregoing paragraph but "such other agricultural commodities and products as the President may designate." This authority the President sub-delegated to the War Food Administrator who, when he found a shortage existent, issued appropriate orders restricting and conserving supply of a particular product, rationing and allocating (1) so that the war effort would not suffer, and (2) so that the civilian food supply could be equitably distributed.

"Milk solids" include milk fats and butter fats. Fats are an indispensible war necessity, greatly in demand in the armed forces of the country. The housewives of the country were appealed to by the government, time and again, to save fats for use by the government in the production of implements of war. The shortage of fats included milk fats, which in turn included milk solids. In his findings that a shortage of milk solids existed the War Food Administrator stated an existing condition. This was neither a caprice nor fiat of the Administrator, nor, as here contended, was it aimed specifically or exclusively against the defendants, their business, or the marketing of their products. A restriction in the use of milk-solids in nonessential food products was a reasonable restriction and was within the scope of the powers so delegated to the Administrator under Executive Order 9280. The restriction applied uniformly to all handlers of similar products. The regulation provided for the filing of a petition for relief from hardship with the Regional Director of Distribution, War Food Administration, and for an appeal from his decision and review of his action by the Director of War Food Distribution whose decision was final. In a statement issued simultaneously with

Amendment 2 to War Food Order 13 the War Food Administration stated:

"W. F. A. officials said the action represents a further effort to save milk solids for more essential war-time uses. * * * This restriction is designed to prevent dealers from marketing a product containing more than the allowed percentage of butter-fat by varying its composition slightly." (9 F.R. 6145).

■ Respondents sought relief under Amendment 2 of said order, in accordance with provisions therewith, and were allotted a quota. Under this quota they were permitted to use not more than 75% of the milk solids used by them in a given base period. Notwithstanding the granting of such relief under the provisions of the amendment to the order complained of, they chose to disregard it as set forth in the six counts of the information. Restriction of essential materials on a quota basis has been a recognized method of rationing during the war and was a valid exercise of the authority of the War Food Administrator in the present situation and under circumstances established in this record. Steuart & Bros. v. Bowles, 322 U.S. 398, 64 S.Ct. 1097, 88 L.Ed. 1350; United States v. Baur, D.C., 60 F.Supp. 162.

■ The argument has been advanced that the "filled cream" regulation was arbitrary and unreasonable on the basis that it prohibited the sale of filled cream having a total content of "all oil and fat, including milk fat, in excess of 19 per cent" and thereby in effect prohibited the sale of a combination that might conceivably have a low milk fat content. Accepting the fact that a low milk fat content might be used in such a product, the fact remains that the product was a luxury developed as a substitute for another luxury, whipping cream. In my opinion the administrator was not unreasonable in phrasing his regulation so as to limit the percentage in the manner he did. It is noted, however, that the affidavit filed in support of the motion to quash states that the percentage of butter fat used in Devonshire Topping is 16.1% by weight. A regulation designed to reduce the amount of milk fat consumed in the sale of a product of that nature cannot be regarded as unreasonable, even though others might have drawn the regulation differently.

The processes leading to the promulgation of Amendment 2 to War Food Order 13 were orderly and logical and, it appears from the whole record, were based on a sound policy of conservation of critical materials for more essential war-time uses as well as in the national interest. There is not apparent here any whim, caprice or fiat of the War Food Administrator in promulgating this regulation. Neither can it be said that under the circumstances present here this action of the War Food Administrator is a denial of the due process of law under the Fifth Amendment to the Constitution, nor can it be said that this was the taking of private property for public use without just compensation. It was a restriction imposed on the respondents in carrying on their business, but the restriction was one within the limits of the authority vested by Congress in the President and redelegated by him to the War Food Administrator. Congress set up adequate standards in the Second War Powers Act and expressed a general policy with reference to future existing shortages in critical materials. The promulgation of War Food Order 13 and Amendment 2 were well within the limits of this broad policy and the standards established by Congress in general terms. The information on file sufficiently sets forth the necessary allegation constituting a criminal offense under the Second War Powers Act.

■■ The motion to quash is supported by affidavit made by one of the individual respondents. In considering this motion, as well as the demurrer, the allegations of the indictment are to be taken as true. The affidavit in support of the motion to quash controverts the allegations contained in the information and is made substantially on information and belief of the affiant. The motion to quash should be denied where the motion is supported by an affidavit alleging the facts set forth therein upon information and belief. Smith v. State of Mississippi, 162 U.S. 592, 16 S.Ct. 900, 40 L.Ed. 1082; Tarrance v. State of Florida, 188 U.S. 519, 23 S.Ct. 402, 47 L.Ed. 572; Kastel v. United States, 2 Cir., 23 F.2d 156, certiorari denied 277 U.S. 604, 48 S. Ct. 600, 72 L.Ed. 1010; Luxemberg v. United States, 4 Cir., 45 F.2d 497, certiorari denied 283 U.S. 820, 51 S.Ct. 345, 75 L. Ed. 1436; United States v. Perlstein, 3 Cir., 120 F.2d 276; Cleveland v. United States, 10 Cir., 146 F.2d 730. The affidavit also contains the conclusions of the affiant

and not facts. United States v. Keller, D. C.Mich., 1923, 288 F. 204; United States v. Cannon, D.C.Mich., 1923, 288 F. 382; Colbeck v. United States, 7 Cir., 10 F.2d 401; Millard v. United States, 5 Cir., 148 F.2d 154.

Since the affidavit only controverts the allegations of the information, it cannot support the motion to quash and should be stricken. United States v. Skidmore, 7 Cir., 123 F.2d 604, 606, certiorari denied 315 U.S. 800, 62 S.Ct. 626, 86 L.Ed. 1201. In the last mentioned case the district attorney moved to strike certain pleas in abatement, or motions to quash, filed by the defendant which contained denials of the facts contained in the indictment. In sustaining the lower court decision granting the district attorney's motion, the appellate court said: "A motion to quash, like a demurrer, will not test the truth of an allegation. Every allegation of appellant in these pleas merely constituted a denial of specific allegations in the indictment." These are matters which can be considered properly and more definitely at time of trial. See also United States v. Frankfield, D.C., 38 F.Supp. 1018.

The information is valid upon its face, apart from extrinsic considerations such as the procedure which the Administrator followed in formulating the regulation, the evidence upon which he acted, the arbitrary or lack of arbitrary quality of the regulation in the light of the surrounding circumstances of the industry, and the arbitrary or lack of arbitrary quality of the application of the regulation to these defendants. On its face the regulation complies with all statutory and constitutional requirements. If there be defects in the regulation, they are not patent. Accordingly, they are not susceptible of determination on a demurrer or motion to quash. United States v. Slobodkin, D.C.Mass.1943, 48 F.Supp. 913.

Defendants' attack is not directed at the face of the information but is an attempt on their part to assert prematurely by way of motion to quash and demurrer matters of defense which may be availed of, if at all, only at the trial of this case.

Plaintiff's motion to strike affidavit in support of motion to quash is granted.

Defendants' demurrer is overruled and the motion to quash is denied.

Orders to that effect will be presented on notice.