## UNITED STATES v. ELADE REALTY CORPORATION et al.

### No. 40806.

District Court, E. D. New York.

Feb. 21, 1946.

Milton M. Burke, of Washington, D. C., for plaintiff.

Joseph W. Wyatt, of Washington, D. C., for third-party plaintiff.

Louis Ottenberg, of Washington, D. C., for third party defendant, Wm. H. Saunders Co., Inc.

HOLTZOFF, Justice.

The third party complaint seems to charge the third party defendant solely

Tetelman & Tetelman, of New York City (Louis J. Castellano, of Brooklyn, N. Y., of counsel), for the motion.

T. Vincent Quinn, U. S. Atty. and Albert DeMeo, Asst. U. S. Atty., both of Brooklyn, N. Y., opposed.

KENNEDY, District Judge.

Defendants demur to an information in 28 counts charging them with willful violations of certain preference orders issued by the War Production Board and general orders of the National Housing Adminis-

tration. The offenses which they committed were the sales of dwellings at Farmingdale, L. I., at a price greater than $4,-990. The information alleges that the defendants procured priorities assistance in order to make possible construction of these dwelling houses, and that in return for this assistance they agreed that the sales price per unit would not exceed $4,-990. The crime charged is the violation of this agreement; or rather of administrative orders requiring compliance with the agreement.

The attack upon the information has its real basis in the contention that Congress never granted any of the administrative agencies here involved the power to fix prices and, therefore, when it denounced violations of the administrative regulations as crimes, it did not include the acts which the defendants committed. In defense of the information the government says that the power to fix prices is fairly to be implied from the language of the Second War Powers Act, Public Law 507, March 27, 1942, as amended by Public Law 509, December 20, 1944, 50 U.S.C.A.Appendix, § 633, and penal sanctions may be invoked against those who violate these valid regulations, even where they forbid breaches of price agreements.

I may say at this point that the briefs submitted by the defendants in support of their demurrer raise no question about the constitutionality of the Second War Powers Act. Nor do the defendants seriously assert that there is any flaw in the delegation to the administrative authorities of such power as Congress did mean to confer by the statute. Although some reference is made by the defendants' counsel to the history of the specific administrative regulations involved (and I shall touch upon this at a later point) their real argument is that Congress did not specifically empower any administrative body to control dwelling house prices, and therefore when defendants sold at a price in excess of their agreement they committed no crime, because the government agency with which they made that agreement exceeded its specific authority when it made sale at a stated price a condition of priority assistance.

The statute so far as it is relevant does indeed make no specific mention of a power to fix or control prices of critical material. The sentence upon which the determination of this motion turns is as follows: Second War Powers Act, supra, 50 U.S.C.A.Appendix, § 633, Sec. 2(a) (2): "Whenever the President is satisfied that the fulfillment of requirements for the defense of the United States will result in a shortage in the supply of any material or of any facilities for defense or for private account or for export, the President may allocate such material or facilities in such manner, upon such conditions and to such extent as he shall deem necessary or appropriate in the public interest and to promote the national defense."

 The President had the right to redelegate the power which Congress gave him (Second War Powers Act, 50 U.S.C.A. Appendix, § 633, Sec. 2(a) (8).) Housing materials and new construction were clearly within the scope of the statute and were therefore made subject to its provisions (Conservation Order L–41, April 9, 1942; 7 F.R. 2730). In conjunction with its system of preference rating orders, the War Production Board consistently made it a condition of priority assistance that owners who received these benefits were required to comply with the representations and promises they themselves made. (Preference Rating Order P–55, September 22, 1941, 6 F.R. 4842; amended March 2, 1942, 7 F.R. 1636; further amended April 20, 1942, 7 F.R. 2940; further amended February 12, 1943, 8 F.R. 1951). The preference rating order mentioned in the information (P–55–c) was originally issued on February 12, 1944, effective March 1, 1944 (9 F.R. 1696; amended April 1, 1944, 9 F.R. 3564; further amended February 5, 1945, 10 F.R. 1483). I emphasize that the liability of owners, who received this priority assistance, to comply with the conditions laid down and the promises made, were never forgotten in any of the preference rating orders, no matter how often they were amended; this requirement quite clearly was and is the keystone of the entire system of control.

So much for the preference rating orders of the War Production Board. In its

general orders the National Housing Administration followed the same procedure. Thus it provided that war houses, the construction of which began prior to February 10, 1943, could be sold or transferred only in accordance with the conditions annexed to the priority assistance received by the owner (National Housing Administration General Order No. 60–2, effective February 5, 1943, 8 F.R. 1829; reissued as General Order No. 60–2A, effective July 14, 1943, 9 F.R. 3066; reissued as General Order 60–2B, effective November 17, 1943, 9 F.R. 245; reissued as Regulation No. 60–2C, effective January 27, 1944, 9 F.R. 2816). The administrative authorities also clearly and expressly restricted the sales prices of war houses to the maximum amounts permitted by the conditions for priority assistance (National Housing Administrative General Order No. 60–3 Sec. 3, subd. .03, effective February 5, 1943, 8 F.R. 1830; reissued as General Order No. 60–3A, effective July 14, 1943, 8 F.R. 12079; reissued as General Order No. 60–3B, effective August 25, 1943, 8 F.R. 12080; reissued as General Order No. 60–3C, effective November 12, 1943, 9 F.R. 247).

There is certainly no lack of clarity about any of this, and, as I have said, the defendants expressly state in their brief that they challenge neither the constitutionality of the Second War Powers Act nor the binding force of valid regulations and orders issued under it. This makes the question at bar a very narrow one indeed. When Congress authorized the executive branch to allocate critical materials upon conditions "necessary or appropriate in the public interest and to promote the national defense" did it mean to give to administrative authority the power to set resale prices of these materials, or the commodities of which they formed part? In other words is it reasonable to suppose that in the interest of national defense Congress, having foreseen shortage of critical materials and, having placed in the hands of the executive the power to allocate them, intended also that if necessary and appropriate the executive, as a condition of priority assistance, could require the owner not to exceed a fixed resale price, and render him liable to criminal prosecution if he did exceed that price?

Certain contentions urged by the defendants can be disposed of more or less summarily. Their attention having been called to the fact that in at least two instances decrees have been granted enjoining defendants against violating similar bargains (U. S. v. Eureka Investment Co., D.Ariz., 66 F.Supp. 637; U.S. v. Molnar, N.D., Ohio E.D., 66 F.Supp. 180), the defendants say this is all very well so far as decrees in equity are concerned, particularly where they merely protect the occupancy status of war workers, but that such cases furnish no pattern for the case at bar. The trouble with this argument is obvious. The Second War Powers Act nowhere specifically delegates power to an administrative body to protect the occupancy status of war workers; yet in the cases I have mentioned the courts enforced the bargain made and used the sanction of imprisonment to enforce it. It seems to me that the form of the proceeding makes no difference; if the power to fix prices can legitimately be implied, and will therefore support a decree in equity, it certainly will support a criminal prosecution.

■ The defendants make another suggestion: they say that the Government has other remedies against the defendant, such as cancellation of the priority orders, or possibly the enforcement of a claim for damages, and therefore the information is defective. I do not consider that this argument is seriously advanced, for it amounts to the statement that the Government can never enforce a statute by criminal prosecution when it has other remedies against the offender, a position which is manifestly untenable.

The real question is how one is to interpret the grant of a power to "allocate" critical materials. The real task is to define the orbit of power that this form of words confers upon administrative authority.

■ I should think that the statute ought to be given the most liberal construction. The defendants say that so far as a power to fix prices is concerned, this

is not so. They point to the fact that in other situations Congress, dealing with price control, has used precise terms in order to circumscribe the grant of the same power (Emergency Price Control Act, 50 U.S.C.A.Appendix, §§ 901–946). They say, or at least imply, that a power in administrative authority to fix prices is so drastic and fraught with such serious consequences that it can never be considered as a mere implied incident of a power to allocate critical war materials for purposes of National Defense. As I have said, they buttress this argument by a comparison between the specific Emergency Price Control Act on the one hand and the very general Second War Powers Act on the other.

■ It is obviously true that in war time, or during any emergency, price control and rationing will merge into any attempt at allocation of materials and facilities. It is clear for example, that if a shortage of grain should develop, then the Administrator whose task was primarily to check inflation and the Administrator whose task was to put war material in the proper hands would find themselves engaged on the same mission and possibly using the same means to accomplish that mission. But this is really a fortuitous circumstance. Standing by itself, it does not conclusively establish that because Congress has seen fit expressly to allocate a price fixing power in one instance, it has necessarily withheld it in every other statute which is silent on the point. On principle, I should suppose that when Congress granted a broad power to allocate critical war materials, it must necessarily have taken into consideration that all kinds of drastic measures would be needed to produce the result which it desired. Suppose that in the depths of the emergency a poll had been taken not only of Congressmen, but of the entire population, on the question whether an Administrator charged with the duty of allocating war material in fact had and should have, the implied power not only to fix prices of resale, but to invoke criminal sanctions to enforce this power. Can there be any doubt what the answer would be? Can there be any doubt that Congress when it granted these pow-

ers, was reluctant to limit them, so long as no Constitutional barriers existed? I know very well that neither war nor any other emergency transcends the Constitution and I am fully conscious of the fact that when emergencies have dissolved into thin air, Courts have a tendency to cast a critical eye upon emergency legislation. I take this wholly natural tendency into account without losing any confidence in my belief that a power to allocate war materials, which certainly implies the taking of property in some form or another, just as certainly implies reasonably the power to annex, among others, the condition that if this material is disposed of the resale price shall not execeed a figure which, in the judgment of the Administrator, is a necessary and appropriate part of the scheme of distribution.

Incidentally, there is nothing to suggest that in the case at bar the price fixed by administrative authority was arrived at by bureaucratic whim or fiat. True, there is nothing within the four corners of the challenged information to demonstrate that the resale price was reasonable. But it is quite plain that the defendants to get something they were after, namely, building materials, voluntarily agreed to limit themselves to an agreed price when they sold the houses they built. It is unthinkable that they went through this elaborate process without calculating their costs and determining that the resale price would yield a profit. It certainly seems an odd contention that administrative authority, which could lawfully have denied to these defendants and builders generally the use of any material at all, went beyond its lawful powers when it framed regulations calculated to foster the improvement of living conditions for war workers and at the same time to permit these defendants to do what they wanted, namely, to build houses.

So far as precedent is concerned, I have been able to find nothing squarely in point. Certainly Judge Hutcheson suggests, Shreveport Engraving Co., Inc. v. United States, 5 Cir., 1944, 143 F.2d 222, certiorari denied 323 U.S. 749, 65 S.Ct. 82, 89 L.Ed. 600, rehearing denied 323 U.S. 815, 65 S.Ct. 128, 89 L.Ed. 648, that the powers

granted under the Second War Powers Act were not to be dissected under a microscope. There, the power to allocate was held to extend to material already in the hands of the defendants, and so in effect there was not merely price fixing on resale as here, but an actual restriction in the use of property, a restriction that surely went beyond mere price fixing by agreement.

In Steuart & Bro. v. Bowles, 1944, 322 U.S. 398, 64 S.Ct. 1097, 88 L.Ed. 1350, the Administrator, attempting properly to allocate fuel oil, suspended a dealer who diverted the material. The argument was made that Congress had not expressly granted the power to issue suspension orders. But the Court held this power was incidental to the power to allocate. It is true that the Court hints its decision would have been different if suspension was merely a mode of punishment, unless Congress had expressly prescribed such a sanction. And the attempt here is to punish these defendants for violating their bargain. But compliance with their agreement was here part of a regulation, and under the Second War Powers Act, Congress has made the violation of such regulations penal offenses. If the power to fix prices as a condition of allocation can be here implied, as the power to suspend was in the Steuart case, the regulation is valid and the express penal sanction appropriate.

█ If these defendants, as a condition of receiving critical war material, had agreed to deliver their finished product to a named munitions plant and no other, and then for a profit sent the material elsewhere, no one would contend that they ought to be unwhipped of justice, and no one would argue that the breach of an administrative regulation designed to prevent such brazen conduct could be punished criminally under the Second War Powers Act. I can see little difference between that situation and the one which is disclosed by the information at bar. It surely would have been a silly performance on the part of the Administrator to divert much needed war materials into houses for war workers if the builder could exact large profits and resell them at a price beyond the reach of those very workers. By their contract, the defendants became in some sense of the word, trustees to see to it that the materials which had been granted them reached the proper hands. One phase of the trust was the price and agreed profit. But when a larger profit became possible, the defendants were for the first time able to see clearly that their agreement was a mere pretense and that they cannot be punished for breaking it.

█ There is some suggestion in the papers that the Government has not correctly labelled the General Orders which the defendants violated. I think the defendants mean that the Government has mistakenly referred to National Housing Administration General Order No. 60-2C as General Order No. 60-2, and to National Housing Administration General Order No. 60-3C as General Order No. 60-3. It never was the law that an information, or an indictment either, is made wholly defective because the penal statute underlying it is incorrectly cited. The important question is whether the defendants know the charge against them; and I can hardly think of a case, having in mind the existence here of an agreement, where the defendants could more fully be informed of the charge than those in the case at bar.

█ Finally, there is a further suggestion on the part of the defendants that profit taking is a sacred field of endeavor which neither Congress nor the Administrator may invade even if it seems necessary to do that in order to protect the nation. Perhaps the defendants do not state their argument thus baldly but what they say amounts to that. It is a doctrine to which I do not subscribe.

Motion denied, submit order.