Dear Mr. Hill,
The Attorney General has considered your request for an Opinion wherein you ask the following questions:
"1. May the Department of Energy deny allocation of fuel as a penalty,to be imposed upon service station operators, fuel distributors andothers similarly situated, when and if they refuse to abide by therules, regulations and orders of the Department?
 "2. Could the Department of Energy order a main supplier, such as anoil company, to reduce or stop allocations of fuel to a service stationoperator or fuel distributor who refuses to abide by Department rules,regulations or orders?
 "3. Would the Department have the authority to enforce allocationthrough curtailment of fuels, or would the Department have to either:
 "A) Establish an administrative tribunal with theDepartment.
 "B) Seek redress through a state court action."
The case law in this jurisdiction specifically confines the rule and regulation making authority of agencies to the limits of the power conferred by statute. Adams v. Professional Practices Commission, Okla.,524 P.2d 932 (1974); Ray v. Thompson, Okla., 456 P.2d 300 (1969). Interpretation of a statute conferring power to an agency should give primary consideration to, according to the words used in the statute, their plain ordinary meaning. In re Certification of Question of State Law, 560 P.2d 195 (Okla. 1977); Ridley Packing Co. v. Holliday,467 P.2d 480 (Okla. 1970).
The relevant Oklahoma statute is 74 O.S. 3364 (1978) which provides:
 "74 O.S. 3364. Responsibilities, duties and authority of Department. — The Department shall have the following responsibilities, duties and authority:
1. To allocate fuels;
 2. To interpret federal guidelines relating to fuel allocation and other energy matters;
 3. To adopt and implement rules and regulations necessary to perform the duties imposed upon the Department by law with regard to fuel allocation programs;
 5. To receive and administer any gifts, grants or other funds made available from any source for use in connection with Federal Allocation Programs."
Clear from the plain ordinary meaning of the language used in the foregoing statute is the authority of the Department under Subsection 3 to adopt and implement rules and regulations necessary to perform the duties imposed upon the Department by law with regard to fuel allocation programs. Under Subsection 1, the Department is unambiguously conferred the duty and responsibility "to allocate fuels" in Oklahoma.
It is, therefore, the opinion of the Attorney General that the Department has authority to adopt and implement such rules and regulations as are necessary to fulfill the Department's duty to allocate fuels in Oklahoma.
Webster's New International Dictionary (unabridged), 2d Ed., defines the verb "allocate" as follows:
"To distribute or assign; to allot."
Therefore, from the plain meaning of the statutory language employed, it is clear that the Department has the power to regulate the allotment of the supplies of fuel available for consumption by Oklahomans.
Nothing in the Department of Energy Act, 74 O.S. 3361[74-3361] et seq. (1978), expressly confers upon the Department authority to enforce its rules and regulations by order. The Court in Adams v. Professional Practices Commission, supra, stated:
 "An administrative agency may not under the guise of its rule-making power exceed the scope of its authority and act contrary to the statute which is the source of its authority. Its authority to make rules for its various procedures does not include authority to make rules which extend their powers beyond those granted by statute . . . ."
 524 P.2d, at 934.
The Department's authority is, inter alia, to allocate fuels, and no statutory authority is conferred to the Department to enforce the allocation scheme through Department sanction. The Department must therefore find resort in the Courts for enforcement of its rules and regulations. Such an interpretation comports to the general rule applied to other jurisdictions. See, 73 C.J.S. Public Administrative Bodies and Procedure 256. Nowhere in the Department of Energy Act, supra, did the legislature state that a violator of the Department's rules and regulations should be subject to sanction by the Department, nor did the legislature proscribe a punishment for violating the allocation rules and regulations of the Department. The power to penalize violators, not being delegated to the Department, should not be seized by the Department through rule-making.
 ". . . . authority to make rules for its various procedures does not include authority to make rules which extend their powers beyond those granted by statute . . . ."
Adams v. Professional Practices Commission, supra.
State courts that have spoken to the issue have stated that the power to define penalties and prescribe punishment is a legislative function that cannot be delegated to a state agency. State v. Bruton, 246 Ark. 288,437 S.W.2d 795 (1969), Broadhead v. Monaghan, 238 Miss. 239, 117 So.2d 881
(1960), Tite v. Tax Commission, 89 Utah 404, 57 P.2d 734 (1936). The federal government follows the same rule. L. P. Stewart and Bro., Inc. v. Bowles, 322 U.S. 398, 64 S.Ct. 1097, 88 L.Ed. 1350 (1944).
It is, therefore, the opinion of the Attorney General that your first question be answered in the negative. The Department was not given the power by the legislature to punish violations of Department rules and regulations nor was a punishment for violation of the rules proscribed by the legislature. The power conferred, i.e., to allocate fuels, does not necessarily embrace the power to punish.
In L. P. Stewart and Bro., Inc. v. Bowles, supra, the United States Supreme Court was presented the issue of whether power conferred the President by Congress in the Second War Powers Act, 56 Stat. 176, to "allocate" included the power to issue suspension orders against retailers and to withhold rationed materials from them when it was established the retailers acquired and distributed the rationed materials in violation of the applicable regulation. The Court rejected the argument that the power to allocate materials does not include the power to issue suspension orders. The rejected rationale was that suspension orders were penalties which could not be imposed without statutory authorization. Although the Court agreed that suspension orders that were designed to punish could not be imposed under the authority of the Act since no provision was made by Congress for such a sanction, the Court rejected that suspension orders must always be construed as intended to penalize the offending party. 322 U.S. at 404. The Court reasoned that if the suspension order was intended as a remedy for making the allocation power effective, it was a remedial exercise of the power to allocate and not punitive in nature, although of great impact to the recipient of the order.
 "The problem of the scarcity of materials is often acute and critical in a great war effort such as the present one. Whether the difficulty be transportation or production, there is apt to be an insufficient supply to meet essential civilian needs after military and industrial requirements have been satisfied. Thus without rationing, the fuel tanks of a few would be full; the fuel tanks of many would be empty. Some localities would have plenty; communities less favorably situated would suffer. Allocation or rationing is designed to eliminate such inequalities and to treat all alike who are similarly situated. The burdens are thus shared equally and limited supplies are utilized for the benefit of the greatest number. But middlemen — wholesalers and retailers — bent on defying the rationing system could raise havoc with it. By disregarding quotas prescribed for each householder and by giving some more than the allotted share they would defeat the objectives of rationing and destroy any program of allocation. These middlemen are the chief if not the only conduits between the source of limited supplies and the consumers. From the viewpoint of a rationing system a middleman who distributes the product in violation and disregard of the prescribed quotas is an inefficient and wasteful conduit. If the needs of consumers are to be met and the consumer allocations are to be filled, prudence might well dictate the avoidance or discard of such inefficient and unreliable means of distribution of a scarce and vital commodity."
 322 U.S. at 404-5.
The Court went on to emphasize the necessity of limiting issuance of suspension orders for reasons relevant to administration of the allocation plan:
 "If petitioner established that he was eliminated as a dealer or that his quota was cut down for reasons not relevant to allocation or efficient distribution of fuel oil, quite different considerations would be presented. But we can make no such assumption here. The suspension order rests on findings of serious violations repeatedly made. These violations were obviously germane to the problem of allocation of fuel oil. For they indicated that a scarce and vital commodity was being distributed in an inefficient, inequitable and wasteful way. The character of the violations thus negatives the charge that the suspension order was designed to punish petitioner rather than to protect the distribution system and the interests of conservation. . ."
 322 U.S. at 406.
It is to be contemplated that the problems inherent to fuel allocation programs have not significantly varied between 1944 and the present. Although the conditions that gave rise to the shortage are different, the necessity for an allotment of available supplies of fuel was apparently foreseen by the legislature that bestowed the power to allocate fuels upon the Department. It is reasonable to conclude that included within the assigned power to allocate fuel is the power to design the allocation and re-allocation system to promote the most efficient, equitable and non-wasteful distribution of fuels.
It is, therefore, the opinion of the Attorney General that your second question should be answered affirmatively but with qualifications. The Department has the power to develop by rule an efficient allocation program encompassing all stages of the fuel supply system, and include therein provisions for the re-allocation of available supplies where it finds that the purposes of the plan are not being met in specific circumstances. Such re-allocation procedures must be in accordance with the rules adopted by the Department and be made pursuant to the Administrative Procedures Act.
In developing rules and regulations under 74 O.S. 3364(4) it will be necessary for the Department to comply with the procedures for administrative rule-making set forth in 75 O.S. 301 — 308 (1971) and all subsequent amendments to said cited sections. In this regard the Department would well take heed of the advice given by the Court in Adams v. Professional Practices Commission, supra, which quote;d the following language with approval from a New Jersey decision:
 "The theory of administrative rule-making is, of course, that in certain fields and in certain respects the public interest is better served by delegating a large part of detailed lawmaking to the expert administrator, controlled by policies, objects and standards laid down by the legislature, rather than by having all the details spelled out through the traditional legislative process. Administrative rule-making remains in essence, however, the enactment of legislation of general application prospective in nature. The object is not legislation ad hoc or after the fact, but rather the promulgation, through the basic statute and the implementing regulations taken as a unitary whole, of a code governing action and conduct in the particular field or regulation so those concerned may know in advance all the rules of the game, so to speak, and may act with reasonable assurance. Without sufficiently definite regulations and standards administrative control lacks the essential quality of fairly predictable decisions. Persons subject to regulation are entitled to something more than a general declaration of statutory purpose to guide their conduct before they are restricted or penalized by an agency for what it then decides was wrong from its hindsight conception of what the public interest requires in the particular situation."
 524 P.2d, at 934.
To answer your third question, it is the opinion of the Attorney General that the Department has no express statutory authority to directly enforce its rules and regulations and therefore must resort to the courts for enforcement. Therefore, an administrative tribunal set up for the purpose of enforcement would be unnecessary. Enforcement of the agency order would require a court order since the Department has no power to enforce its orders.
In summary, it is the opinion of the Attorney General that 74 O.S. 3364(1978) vests the Department of Energy with the authority to allocatefuels and to adopt rules and regulations necessary for the accomplishmentof its duty to allocate fuels. The Department was not given authority topunish violators of its rules and regulations and may not by rule providea punitive sanction of its own for the enforcement of its rules. TheDepartment possesses the power to adopt rules and regulations designed toprotect the allocation plan of the Department and re-allocation ofavailable supplies for the purpose of efficient, equitable andnon-wasteful distribution would be an exercise of that power. Exercise ofthe rule making authority conferred by 74 O.S. 3364(4) must be inaccordance with the Administrative Procedures Act, 75 O.S. 301[75-301] etseq. (1971). Enforcement of the Department's power to allocate fuels wasnot expressly conferred to the Department and therefore resort must bemade to the Courts to enforce said power.
JAN ERIC CARTWRIGHT, ATTORNEY GENERAL OF OKLAHOMA
CHARLES S. ROGERS, ASSISTANT ATTORNEY GENERAL