LEWIS et al. v. ANDERSON, Secretary
of Agriculture, et al.

No. 6932.

District Court, S. D. California,
Central Division.

June 9, 1947.

Sheppard, Mullin, Richter & Balthis, Frank S. Balthis, Jr., and Gordon F. Hampton, all of Los Angeles, Cal., and Thompson & Colegate, and H. L. Thompson, all of Riverside, Cal., for plaintiffs.

George H. Layman, David S. Korn, and J. J. Schalet, all of Washington, D. C., and Arthur Lasher, of Los Angeles, Cal., for defendants.

YANKWICH, District Judge.

Wars have never actually terminated on the day "cease-fire" orders were given. Many of them continued for decades, not so much in the form of actual fighting, but in the disruption and dislocation which they caused in the life of the nations involved. These facts, which are truisms to any student of history, apply especially to modern warfare, as exemplified by the last war. The destruction and the dislocation of the economic life of both the victor and the vanquished continue and will continue for years after the actual hostilities with Germany and Japan ended. And so those who are in charge of regulating and controlling the economic life of the nations involved in war have the difficult problem of determining when the various controls should come to an end. Wishful and unrealistic thinking call for immediate cessation of all governmental interference with economic life. Prudent statesmanship, economic or other, realizes the danger of immediate decontrol. The persons who are loudest in demanding the immediate return to free economy complain most vociferously about "sudden" decontrol. Rightly. For economic life cannot stand "sudden shocks". Adjustment from war to peace-time economy, if it is to be helpful, must be gradual.

The failure to understand these fundamental economic principles is responsible for many of the contentions which are now made before the courts. Some litigants wish us to adopt the view that, regardless of what the Congress does, the actual cessation of war actually entitles businesses or activities under control to be relieved from it.

The case before us is, in the main, grounded upon similar conceptions.

It assumes that, because control of commodities has ended and the Congress in the First Decontrol Act of 1947, Public Law 29, 80th Congress, Chapter 29, 1st Session, S. 931, 50 U.S.C.A.Appendix, §§ 633 note, 645, has declared that "emergency controls and war powers should not be exercised by the grant of broad, general war powers but should be granted by restrictive, specific legislation", even as to those commodities, such as sugar, as to which control has continued, courts should adopt a narrow interpretation of the powers granted.

In the particular case, plaintiffs would have us hold that, despite the fact that the Sugar Control Extension Act of 1947, Public Law 30, 80th Congress, Chapter 30, 1st Session, H. J. Res. 146, 50 U.S.C.A.Appendix, §§ 981–985, has continued control of sugar and has continued with respect to it all the emergency laws, that the administrative powers, which are the core of any control, are at an end. The answer to the chief contention made in this respect is contained in Fleming v. Mohawk Wrecking & Lumber Company, etc., 67 S.Ct. 1129, 1132, and in which Mr. Justice Douglas wrote for the Court: "On December 31, 1946, after the creation of the Office of Temporary Controls, the President, while recognizing that 'a state of war still exists,' by proclamation declared that hostilities had terminated. *The cessation of hostilities does not necessarily end the war power.* It was stated in Hamilton v. Kentucky Distilleries & W. Co., 251 U.S. 146, 161, 40 S.Ct. 106, 110, 64 L.Ed. 194, that the war power includes the power 'to remedy the evils which have arisen from its rise and progress' and continues during that emergency. Stewart v. Kahn, 11 Wall. 493, 507, 20 L.Ed. 176. *Whatever may be the reach of that power, it is plainly adequate to deal with problems of law enforcement which arise during the peric ' of hostilities but do not cease with them."* (Emphasis added.)

The Circuit Court of Appeals for the Ninth Circuit in Fippin et al. v. United

States, 162 F.2d 128, said: "They contend that the Order (VHP-1) issued by the Administrator is an attempt to exercise the war powers of the Federal Government and since hostilities have ceased any use of the war powers to control a peace time emergency is unconstitutional and void. To bolster this argument they cite the opinion of Justice Holmes in Chastleton Corp. v. Sinclair, 264 U.S. 543, 547, 44 S.Ct. 405, 406, 68 L.Ed. 841, where he said: 'A law depending upon the existence of an emergency or other certain state of facts to uphold it may cease to operate if the emergency ceases * * *' Assuming without deciding that the powers asserted in VHP-1 are 'war powers', the argument of appellants fails in that, although the hostilities have terminated the emergency upon which the First and Second War Powers Acts depend still exists. Fleming v. Mohawk Wrecking Lumber Co., 67 S.Ct. 1129. It follows, therefore, consistent with the views of Justice Holmes, that the 'war powers' could be and properly were exercised in and through the Order (VHP-1) by the Civilian Production Administration."

So we have two very recent declarations by our highest courts which hold definitely that the President's proclamation of cessation of hostilities *did not* necessarily end the exercise of war powers, unless a specific Congressional Act declared that there should be such cessation upon the making of the proclamation or thereafter terminated them. And so the problem presented in this case is very simple.

 Regardless of what theorizing we may do, the exercise of war powers conferred by special Acts of the Congress, do not terminate unless a statute says so. Administrative agencies charged with exercising control may continue to exercise the same broad powers they exercised before, unless specifically forbidden by the Congress. And no court can, on the basis of generalities, determine that the present necessities call for more restricted exercise of the powers.

The Complaint in this case was filed on May 2, 1947. It contained many allegations of the type we have just referred to. The existence of the power to continue control of sugar and the constitutionality of even the specific Act of the Congress to continue control were both challenged. In view of what has been said, these need not detain us at all. For the contentions are, as I stated at the trial, without merit. See my opinion in Gray v. Commodity Credit Corporation, D. C. Cal. 1945, 63 F.Supp. 386, affirmed in Gray v. Commodity Credit Corporation, 9 Cir., 1947, 159 F.2d 243.

Only one question is really involved. And that is, whether the Sugar Control Act of 1947 continues the power to suspend for violation of allocation, orders of sugar.

But first, to a brief recital of the facts in the case.

The plaintiffs are engaged in the grocery business in Riverside, Riverside County, California. They have an old business, which was established by the father of Paul A. Lewis. Of the two stores operated by them, the main store is, perhaps, the largest of its kind in Riverside, doing a business of a quarter million dollars per month. Because of their long operation, they have contracts for delivery of groceries, including sugar, to some public institutions, such as hotels, restaurants, hospitals, the County Jail and the County Detention Home. During the rationing period from April 28, 1942, to September 1, 1946, the two stores sold 2,518,937 pounds of sugar. Upon investigation, it was discovered that they had overdrawn their ration bank account as of September 4, 1946, to the extent of 91,476 pounds. An administrative hearing was had, which resulted in an order being made on November 25, 1946, suspending the allocation for a period of 45 days. An appeal was taken from the order and the hearing Administrator, on April 28, 1947, affirmed the order and made it permanent. Under the provisions of the 1944 Amendment of the Second War Powers Act, 50 U.S.C.A.Appendix, § 633, which gave the District Courts exclusive jurisdiction to enjoin or set aside in whole or in part an order of suspension, this action was instituted on May 2, 1947. At the hearing on the Order to Show Cause why a Temporary Injunction should not issue, on May 26, 1947, I suggested that, in view of the urgency of the matter, the cause be tried forthwith on its merits. Counsel for both sides agreed

and the cause was tried on the days to follow. I have before me for decision both the request for injunction and the decision of the cause on the merits.

■■ What I have already said leaves but one question to determine—whether the Sugar Control Act of 1947 did away with the power of suspension. The contention that this is the case is grounded chiefly upon the provision of Section 1(a) (2) of the Act, which reads:

"(2) no person shall be subject to any criminal penalty or civil liability, under any provision of law referred to above, on account of any act or omission which is made unlawful by Section 4 of this Act".

This section must be read in conjunction with the Preamble which specifically provides that *"notwithstanding any other provisions of law"* the Emergency Price Control Act of 1942, 50 U.S.C.A.Appendix, § 901 et seq., the Stabilization Act of 1942, 50 U.S.C.A.Appendix, § 961 et seq., the Second War Powers Act of 1942, 50 U.S.C.A.Appendix, § 631 et seq., and other Acts specifically mentioned, shall continue in effect with respect to sugar to and including October 31, 1947.

The Supreme Court in Steuart & Bros. v. Bowles, 1944, 322 U.S. 398, 64 S.Ct. 1097, 1100, 88 L.Ed. 1350, has held specifically that these statutes give the power to "allocate commodities" and to suspend allocations to persons found guilty of violating the regulations. And the language there used by Mr. Justice Douglas applies to the power sought to be exercised in this case. He wrote:

"The suspension order rests on findings of serious violations repeatedly made. These violations were obviously germane to the problem of allocation of fuel oil. For they indicated that a scarce and vital commodity was being distributed in an inefficient, inequitable and wasteful way. The *character of the violations thus negatives the charge that the suspension order was designed to punish petitioner rather than to protect the distribution system and the interests of conservation.* Moreover, there is the following finding in support of the limitation on the number of customers which petitioner may hereafter service:

" 'We have no way of knowing how many customers the respondent corporation can serve while at the same time faithfully observing the rationing regulations. But we do know from its clearly established violations from the very inception of fuel-oil rationing that the number it then served approached the upper limit of its capacity since the fact is clear that it did not (whether it would not or could not) thereafter both service this number and simultaneously comply with the rationing regulations. Additional customers, then, clearly impose a burden which the respondent cannot bear.'

"None of the findings is challenged here. Taken at their face value, as they must be, they refute the suggestion that the order was based on considerations not relevant to the problem of allocation. They sustain the conclusion that in restricting petitioner's quota the Office of Price Administration *was doing no more than protecting a community against distribution which measured by rationing standards was inequitable, unfair, and inefficient. If the power to 'allocate' did not embrace that power it would be feeble power indeed."* (Emphasis added.)

Counsel seem to derive much comfort from the statement, *arguendo,* which preceded the portion just quoted, that if the petitioner "establish that he was eliminated as a dealer or that his quota was cut down for reasons *not relevant* to allocation or efficient distribution of fuel oil, quite different consideration would be presented." They seem to think that this gives us the power to inquire whether there is such relevancy or not. But this argument, as I stated at the trial, overlooks the fact that the Congress, in giving us the power to review orders of the type made in the instant case, *made the grant in the framework of the law of administration as we know it.* In other words, our power to review merely means the power to determine whether there is substantial evidence to sustain the action taken in the case.

■ Mr. Lewis admitted in open court that the facts to which he testified in this court as well as facts relating to the cause of shortage were gone into before the hearing commissioner. I have before me a transcript which shows that under the

guidance of the same counsel which represented him in this case, all the details of the sugar transaction and all excuses which blamed inefficient help for the shortage were gone into. There being, therefore, substantial evidence to sustain the order, I am powerless to set it aside. See Unemployment Commission v. Aragon, 1946, 329 U.S. 143, 154, 67 S.Ct. 245; United States v. Morgan, 1941, 313 U.S. 409, 61 S.Ct. 999, 85 L.Ed. 1429; United States v. Standard Oil Co., D.C.Cal.1937, 20 F.Supp. 427; United States v. Standard Oil Co., D.C.Cal.1937, 21 F.Supp. 645; Standard Oil Co. v. United States, 9 Cir.1940, 107 F.2d 402; Redlands Foothill Groves v. Jacobs, D.C.Cal.1940, 30 F.Supp. 995; Yankwich, On Control of Appeals, 1946, 5 F.R.D. 517, 518 and cases cited in Notes 1 and 2.

The allocation of commodities or "channeling them",—to use the language of Mr. Justice Douglas,—from one dealer to another, proved the most effective method of control.

Criminal prosecutions are illusory, especially in these days when most business is done under corporate names. It merely means the imposition of a fine. Actions for treble damages do not achieve the desired result. For, ultimately, a person who is a flagrant violator could readily afford to pay such damages as if they were a license fee for the privilege of doing business in defiance of the regulations. But when the power to handle the commodity is taken away from a violator, he is hit in the only place where it hurts,—his economic interest. The Administrator then speaks to him the language he understands well,—economic detriment, to flow from violation. And, unless the ruling is clearly arbitrary, a dealer cannot complain because he is deprived of the right to deal in a commodity, after a fair hearing at which violations are proved. The answer to his complaint is in Molière's famous "Tu l'as voulu, Georges Dandin".

■ I do not believe that the Congress, in maintaining all the powers under the statutes enumerated as to sugar, intended by Section 1(a) (2) of the Resolution

to deprive the Government of the United States of this administrative weapon. When they referred to criminal penalties or civil liabilities, they used terms which have a definite meaning. Criminal penalty means a fine or imprisonment imposed by law after prosecution by indictment or information. A civil liability is a sum of money assessed either as general, special, or liquidated damages, either single, double or treble, for violation, such as overcharges. *Both phrases relate to remedies administered through court proceedings. Neither covers administrative action, no matter how coercive.* In Gallagher's Steak House v. Bowles, 2 Cir.1944, 142 F.2d 530, 535, the Court recognizes this distinction between remedies administered judicially and administrative procedures, by saying: "The so-called suspension order here involved was merely an attempt to correct such a situation. *It did not, in the opinion of a majority of the court, require the appellant to do anything by way of retribution for any past acts or offenses. It was only an order of re-allocation.* * * * Being an appropriate means to make allocation effective, the order in this respect was a lawful exercise of the authority delegated to the agency which made it. * * * *Any civil remedy by way of enforcement of a right or duty created or any criminal prosecution for a crime which had been or might be committed was left to be pursued in the District Courts.* The plaintiff was put under no compulsion, *except an economic one,* to use for any purpose the points it received. That the force of circumstances might *compel their use in the limited way permitted and thus might be coercive is not conclusive on the question of the agency's power to impose such a limitation.* Hawker v. New York, supra [170 U.S. 189, 18 S.Ct. 573, 42 L.Ed. 1002]; A. Magnano Co. v. Hamilton, 292 U.S. 40, 54 S.Ct. 599, 78 L.Ed. 1109; Helvering v. Mitchell, 303 U.S. 391, 58 S.Ct. 630, 82 L.Ed. 917, *Those who must or who elect to use food which is allocated have to bear the ourden which a just and equitable allocation entails.*" Gallagher's Steak House v. Bowles, 2 Cir., 142 F.2d 530, 535. (Emphasis added.)

It follows that suspension of allocation is neither a criminal penalty nor a civil liability, is unaffected by the Decontrol Act of 1947, and is retained by the Sugar Control Act of 1947. It is an administrative order which diverts a scarce commodity from one who wastes it to another who would use it to the better advantage of the economic life of the nation. As the Congress turned over the unexpended funds for all the surviving activities to the Secretary of · Agriculture, including "allocations", it is clear that they had no intention of tying the hands of the Secretary of Agriculture by depriving him of this power and limiting him in future control to the criminal penalties or to injunctive relief. I think the words of Mr. Justice Frankfurter in United States v. Morgan, 1941, 313 U.S. 409, 422, 61 S.Ct. 999, 1005, 85 L.Ed. 1429, are applicable to the situation confronting us: "It will bear repeating that although the administrative process has had a different development and pursues somewhat different ways from those of courts, they are to be deemed collaborative instrumentalities of justice and the appropriate independence of each should be respected by the other." This disposes of the matter.

However, I desire to advert to two matters referred to at the trial, because they are of a character, which, to use the language of the street, show that those in charge of this administrative investigation "rubbed it in", as it were. To particularize, at the hearing on appeal, the administrator increased the penalty from forty-five days suspension to suspension for the duration of sugar control. It may well be that the shortage of the plaintiffs is so great that they could never make it up. But if the forty-five days would accomplish the purpose, · the plaintiffs are entitled to this "face-saving" tolerance. More, it is not good administrative or governmental policy for an officer who reads a cold record to substitute his judgment as to the penalties for that of the officer who heard the witnesses. After all, we are all bound, on review, to respect the findings of an administrative officer unless they are clearly erroneous.

Another matter. I believe now that sugar rationing is in its last stages, the requirement that the plaintiffs maintain a placard announcing that they have been suspended for violation is also a harsh measure. It achieves no result. It will not enforce compliance on the part of the plaintiffs. They can be prosecuted for future handling of sugar illegally as effectively without advertising the violation. Hence my disapproval of the two methods pursued.

However, such disapproval does not alter the conclusion reached that the complaint is without merit and that the power exercised in this case is constitutional and valid and beyond the power of this court to stay.

Judgment will, therefore, be for the defendants that plaintiffs take nothing by their action. The Order to Show Cause why an injunction should not issue is discharged. Injunction is denied and the Temporary Restraining Order heretofore issued is dissolved.