DISTRICT OF COLUMBIA, Appellant,

v.

WILLARD ASSOCIATES, Appellee.

No. 93–TX–1123.

District of Columbia Court of Appeals.

Argued Feb. 8, 1995.

Decided March 20, 1995.

Lutz Alexander Prager, Asst. Deputy Corp. Counsel, Washington, DC, with whom Vanessa Ruiz, Acting Corp. Counsel at the time, and Charles L. Reischel, Deputy Corp. Counsel, were on the brief, for appellant.

Stanley J. Fineman, with whom Louis P. Robbins and David A. Fuss, Washington, DC, were on the brief, for appellee.

Before FARRELL and KING, Associate Judges, and KERN, Senior Judge.

FARRELL, Associate Judge:

For the tax year 1990, appellee Willard Associates ("Willard") failed to submit in timely fashion information required annually by the Mayor of the District of Columbia to assist in the apportionment of "mixed use" property for purposes of real property taxation. A regulation adopted by the Mayor through the Department of Finance and Revenue (the "Department") provided that in the event this information was not submitted in time, "the Director [of the Department] shall classify the affected taxpayer's real property as Class Four Property for the next taxable year." 9 DCMR § 327.4 (1994). The Director invoked this regulation and reclassified Willard's property from its previous mixed use status (Class Three and Four) to Class Four for the tax year 1990. Willard experienced a significant tax increase for that year as a result. The question before us is whether this regulation exceeds the authority delegated to the Mayor by the governing statute. We hold that, at least as applied to the property in question here, it does not, and we reverse a contrary determination by the trial court.

## I.

The District of Columbia's real property tax law requires annual assessments of all real property in the District. D.C.Code § 47–801 et seq. (1990 & Supp.1994). The assessed value of the property is its estimated market value as of January 1 of the year preceding the tax year. Id. § 47–820(a). After allowing a period for taxpayers to challenge the assessments, the Mayor issues a final assessment roll by June 30. Id. § 47–825(g).

Once property is assessed, it is assigned one of five classifications [1] according to use in order to permit application of the proper tax rate to the assessed value. The rates increase in ascending order by class. Of concern here, improved commercial property regularly used to furnish lodging to transients, such as hotels and motels, is designated Class Three property, while all other im-

---

1. At the time in question here, there were four classes. The fifth class, added in 1990, pertains to vacant and unimproved property.

proved and occupied commercial property is designated Class Four property. *Id.* § 47–813 (c–1)(3)–(4).[2] The statute also provides for classification of "mixed use" property: "when the uses of real property fall within more than 1 of the classes enumerated ..., the total assessed value of the property shall be apportioned into the appropriate classes of real property ..., and each of the areas resulting from the apportionment shall be taxed at the appropriate real property tax rate." *Id.* § 47–813(f)(1). The statute further provides that "the Mayor shall devise a method for apportioning, by class, real property whose uses fall within more than 1 class." *Id.* § 47–813(f)(2). As part of this process, "[t]he Mayor may require an owner of real property to submit, at a time and in a form prescribed, such information relating to the uses of property as in the Mayor's judgment will assist in the apportionment of property by class for real property classification purposes...." *Id.* Finally, the statute authorizes the Mayor "to promulgate such rules and regulations as may be necessary to carry out the provisions of this act." *Id.* § 47–814.

Purporting to act under this authority, the Mayor in 1980 promulgated regulations governing the apportionment of mixed use property, the primary feature of which is a requirement that "affected taxpayers" file annually a "mixed use form." 9 DCMR § 327.1.[3] Although "[t]he Director shall make every effort to afford affected taxpayers the opportunity to apply and qualify for mixed use status," the regulation declares that "it shall be the affected taxpayer's responsibility to inform the Director of the existence of a mixed use property by properly completing and timely filing the mixed use form." *Id.* The form, as pertinent to this case,

> shall contain a request for the following general information with respect to the

mixed use property for the reporting period in question:

> \* \* \* \* \* \*
>
> (b) The square foot area of ... improved real property defined as Class Three Property, if any, and the square foot area of improved real property defined as Class Four Property, if any....
>
> \* \* \* \* \* \*
>
> (d) The total building area (square foot area) of ... Class Three Property, if any, and Class Four Property, if any....

9 DCMR § 328.3.[4] The completed form must be filed annually by June 1 "of the year in which the forms are mailed to affected taxpayers," *id.* §§ 329.1, 329.10, although a timely filed request for extension of time may be granted by the Director. *Id.* §§ 329.7, 329.8. Of key importance here, § 327.4 declares:

> If any mixed use form is not submitted (postmarked) to the Department on or before June 1st of the year in which such forms are mailed to affected taxpayers, or within the time extended by the Director, or any mixed use form is timely submitted (postmarked) on or before June 1st, but is either inaccurate or incomplete and, after written notice from the Director and, in the opinion of the Director, remains inaccurate or incomplete, *the Director shall classify the affected taxpayer's real property as Class Four Property for the next taxable year* (July 1st—June 30st [sic]). [Emphasis added.]

In limited circumstances, however, the Director may grant relief from an untimely filing:

> Whenever the mixed use form or information sought under the form, or records or documents sought to completely and accurately inform the Director as to the mixed

---

**2.** The category of Class Three, reflecting less intensive use of commercial property, was established by the legislature in 1985 to ease the tax burden on hotels and indirectly to promote tourism in the District. *See* Report of the Comm. on Finance and Revenue on Bill 6–268, The Real Property Tax Rates for Tax Year 1986 and Classification Revision Act of 1985 at 4 (July 3, 1985).

**3.** An "affected taxpayer" is "an owner of real property in the District who is required to file a mixed use form in accordance with the provisions of this section." 9 DCMR § 327.2.

**4.** Similar information must be provided with respect to mixed use of Class One or Two properties combined variously with Class Three or Four properties.

use of the property are not submitted in the time provided for by this chapter, and it is shown to the Director's satisfaction that the failure to provide the form, information, record, or document was due to reasonable cause *and was not due to simple neglect,* the Director shall apportion the mixed uses of the property according to the best information available.

*Id.* § 327.6 (emphasis added).

## II.

Willard is a limited partnership that owns two buildings in the 1400 block of Pennsylvania Avenue, N.W., one the Willard Hotel and the other the Willard Office Building. In each of the years just preceding tax year 1990, Willard (through the Oliver Carr Co.) had filed timely information concerning the mixed use of the property. In those filings, it claimed that 50.2% of the property was used for the hotel and the remaining 49.8% for other commercial uses. The property was taxed accordingly for those years.

For the tax year 1990, Willard did not submit the prescribed information by June 1, 1989, and did not request an extension of time in which to file. Accordingly, the Department classified the entire property as Class Four for that year, which began on July 1, 1989. For that tax year, the Department had mailed an estimated four thousand mixed use forms to property owners requesting information concerning property usage. Of the estimated four thousand owners, approximately eleven hundred supplied information, and their properties were classified and apportioned accordingly. The remainder, including Willard, failed to file in time and their properties were treated as Class Four commercial property. On March 26, 1990, more than nine months after the information was due, Willard attempted to file the mixed use form, again claiming that the property was used as hotel and commercial property in the ratio of 50.2% and 49.8%. As Willard did not demonstrate reasonable cause not attributable to "simple neglect,"[5] the Department did not change the classification.

Willard paid the assessed tax for 1990 as required, then filed suit in Superior Court contending that the Mayor had violated D.C.Code § 47–813(f)(1) by "fail[ing] to apportion the subject property into the appropriate classes of real property (*viz.,* Class 3 and Class 4) and to tax that apportioned property at the appropriate real property tax rate." On cross-motions for summary judgment, the trial court ruled in Willard's favor, ordering the Department to reclassify the property "to reflect its mixed-usage as Class 3 (50.2%) and Class 4 (49.8%)," and to refund to Willard $115,340.87 with interest. The court explained:

[T]his is an imposition of an improper regulatory penalty of forfeiture which is not specifically provided for in the statute and ... it would be impermissible to tax, to deny this taxpayer the classification as is provided ... under [D.C.Code § 47–813(f)(1) and (2) which] does not specifically authorize the imposition of any type of penalty or financial consequences ... for failure to comply with [§ 47–813(f)(2) ], and it cannot be properly done in the administrative regulation ... because [the Department] didn't have statutory authority upon which to do it.

The District brought this appeal.

## III.

This case turns essentially upon interpretation of D.C.Code § 47–813(f)(1) and (2). Willard contends, and the trial court agreed, that the former subsection imposes what amounts to an unqualified obligation on the Department to apportion mixed use property "into the appropriate classes," in this case Classes Three and Four. While the statute concededly authorizes the Department to do so "according to the best information available," 9 DCMR § 327.6, including past or current information furnished by the taxpayer, what it does not allow the Department to do—Willard contends—is to employ a conclusive presumption of full (*i.e.,* non-mixed) commercial use of property from the fact alone of non-excused failure to submit information in the form and manner prescribed by the regulations. That presumption, em-

---

5. Willard does not argue otherwise in this ap-     peal.

bodied in 9 DCMR § 327.4, Willard characterizes as a forfeiture or penalty, which is unauthorized by the statute and therefore violates the principle that, particularly in regard to taxation, "the law does not permit" a penalty to "be imposed by regulation." *Commissioner of Internal Revenue v. Acker*, 361 U.S. 87, 92, 80 S.Ct. 144, 147, 4 L.Ed.2d 127 (1959).

The Department argues, to the contrary, that the regulation does not impose a penalty but instead implements the broad legislative delegation to the Mayor of the authority to "devise a method for apportioning," one which expressly may include a "require[ment]" that the taxpayer submit information needed "in the Mayor's judgment" to permit accurate and current apportionment and assessment of real property. The statute, in other words, creates no unqualified entitlement to the apportionment of mixed use property, but rather a *conditional* right expressly made dependent on delegated power to the Mayor to insist on ("require") submission of needed information in a form and at a time of his choosing. At the very least, the Department argues, the regulation is a permissible interpretation of its implied authority by the agency charged with administering the statute, in circumstances where the legislature has not "unambiguously" addressed the "precise question" at issue. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). *See also Timus v. District of Columbia Dep't of Human Rights*, 633 A.2d 751, 758–59 (D.C. 1993) (en banc).

The District points to our recognition that the Mayor's understanding of his statutory authority in "administer[ing] the revised tax law" is "entitled to be given great weight." *District of Columbia v. Catholic Univ. of Am.*, 397 A.2d 915, 919 (D.C.1979). Willard counters, however, that "it is axiomatic that a regulation [must] be consistent with the statute under which it was promulgated," *id.*, and relies also upon the rule that "[i]n case of doubt," tax laws "are [to be] construed most

strongly against the government, and in favor of the citizen." *Gould v. Gould*, 245 U.S. 151, 153, 38 S.Ct. 53, 53, 62 L.Ed. 211 (1917). Yet, as this court has observed, the latter rule is qualified by "the maxim that 'tax laws ought to be given a reasonable construction, without bias or prejudice against either the taxpayer or the state, in order to carry out the intention of the legislature and further the important public interests which such statutes subserve.' " *District of Columbia v. Acme Reporting Co.*, 530 A.2d 708, 712 (D.C. 1987) (quoting 3A SUTHERLAND, STATUTES AND STATUTORY CONSTRUCTION § 66.02 (C. Sands, 4th ed. 1986)). Additionally, resolving "doubt[ful]" tax cases against the government appears too simplistic in an administrative era when, as the *Chevron* principle reflects, legislatures often delegate broadly to agencies, and courts in turn defer to reasonable administrative understandings of uncertain legislative commands.

■ Neither by itself nor in its statutory framework does D.C.Code § 47–814(f) resolve unequivocally whether the Mayor may condition the entitlement to mixed use apportionment on submission of necessary information by the taxpayer. We therefore will accept the Mayor's understanding embodied in 9 DCMR § 327.4 if it is a "reasonable construction" of the authority delegated to him by the statute. *Acme Reporting Co., supra.* At least in the present case, involving property all of which is conceded to be commercial,[6] we hold that it is. We thus do not consider whether the regulation, consistent with the statute or other legal principles, would allow reclassification of partly residential property (Class One or Two) to Class Four based solely on the owner's failure to submit the required information.

■ D.C.Code § 47–814 generally authorizes the Mayor "to promulgate such rules and regulations as may be necessary to carry out the provisions of this act." But, significantly, § 47–813(f), dealing with apportionment, contains its own specific delegation of authority. While it mandates apportionment and taxation of "each of the areas resulting

---

**6.** As indicated previously, Class Three property is a form of "improved commercial real property," and Class Four property, at the time of the events

in question, included all commercial (*i.e.*, non-residential) property except Class Three. D.C.Code § 47–813(c–1)(3) & (4).

from the apportionment ... at the appropriate real property tax rate," it says nothing in particular about how this is to be done. Instead, uniquely in the real property tax statute, it instructs the Mayor to "devise a method for apportioning...." Willard does not dispute that this "method" may include a procedure by which the Mayor elicits from the property owner information necessary to the apportionment.[7] But the statute goes further and permits the Mayor to *insist on* the cooperation of the owner in timely submission of that information. "The Mayor may *require* an owner of real property to submit, *at a time* and in a form prescribed, such information relating to the uses of property as *in the Mayor's judgment* will assist in the apportionment of property by class ..." (emphasis added). A reasonable interpretation of this language is that the Mayor's duty to apportion an individual property depends upon the owner's submission of information about use which the Mayor deems necessary, at a time and in a form the Mayor may prescribe.

Willard contends that this reads more into the statutory language than is there. It maintains that the words "shall be apportioned" mean that the Department *must* apportion mixed use properties based on available information, a duty it is not relieved of by taxpayer non-compliance with a reporting requirement. As we understand Willard's position, the Department may solicit information about the current mixed use (if any) of a property from the owner, but if the owner neglects to respond, the Department nonetheless must apportion based on whatever other information it possesses—whether data supplied by the owner in past years, or furnished for other purposes,[8] or the fruits of the Department's own inspection of the as many as four thousand properties it has rea-

son to believe involve mixed usage. The reasonableness of this interpretation is hardly compelling. The statute logically intends apportionment to reflect current and not past use of the property. And the Mayor's express authority to "require" taxpayer cooperation in that process reflects the impracticality of imposing on the Department the task of ferreting out annually information as to actual percentage use of the multitude of commercial properties in the District. In the trial court, Willard was asked if its reading meant that the statutory "require[ment]" of owner assistance "has no teeth to it at all." Its response was a candid, "That is right. It doesn't." The reasonableness of a construction of law "can often be tested by considering the consequences of a different one." *District of Columbia v. Seven–Up Washington, Inc.,* 93 U.S.App.D.C. 272, 276, 214 F.2d 197, 201, *cert. denied,* 347 U.S. 989, 74 S.Ct. 851, 98 L.Ed. 1123 (1954). Willard's admission adds weight to the reasonableness of the Mayor's interpretation by comparison.[9]

Willard next invokes the principle of *in pari materia,* pointing out that elsewhere in Title 47, when the legislature meant to condition a tax benefit upon the performance of some act by the taxpayer, it "used clear and precise conditional language to reflect its intent." An example is D.C.Code § 47–1007, dealing with exempt property, which requires the claimant of an exemption to file a report before March 1 of each year "showing the purposes for which its exempt property has been used during the preceding calendar year," *id.* § 47–1007(a); if the report "is not filed within the time provided herein ... the property ... shall immediately be assessed and taxed until the required report is filed...." *Id.* § 47–1007(b). Another example is the statutory homestead deduction for Class One property: "[t]o obtain the deduc-

---

**7.** WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY defines "method" generally as "a procedure or process for attaining an object."

**8.** Willard, for example, relies on certain "income and expense" information it filed as required for assessment of property value. 9 DCMR § 330.4 The District disputes the relevance of this information to the classification decision.

**9.** Willard seizes on the statutory verb "assist" (the taxpayer may be required to submit informa-

tion that "will assist" the Mayor in apportionment) as further implying that taxpayer failure to report as required cannot relieve the Mayor of his duty to apportion. Fairly read, however, the verb merely confirms that the ultimate responsibility to apportion lies with the Mayor, not the taxpayer; it says nothing about the consequences the Mayor may attach to failure to cooperate in the apportionment process.

tion" the taxpayer must file an application prescribed by the Mayor by June 1 preceding the tax year. *Id.* § 47–850(e)(1)(A). It is true that, unlike these provisions, the words "[t]he Mayor may require" in § 47–813(f)(2) do not condition apportionment expressly on submission of the required information. But, as already explained, only in regard to apportionment did the legislature delegate comprehensively to the Mayor the duty to "devise a method" for real property taxation, and the corresponding authority to require taxpayer submission of information as to use of a kind, and *in a time* and form, left to "the Mayor's judgment." [10] This exceptional delegation to the executive reflects what the legislature no doubt saw were the special complexities of apportioning a great number of mixed use properties annually in the District. How it treated other matters of taxation thus seems to us an unreliable gauge of its intent in § 47–813(f). The statute's failure to specify the effect of noncompliance with the reporting requirement it authorizes does not compel, or even favor, an interpretation that makes that requirement merely directory and unenforceable.[11]

■ Willard's final challenge to 9 DCMR § 327.4 is to contend that the regulation is a "forfeiture" or "penalty" that violates D.C.Code § 47–861, in which the Council of the District of Columbia reserved to itself the authority to "establish penalties" for transgressions of the real property tax statute.[12] Willard also points to the general rule that " 'penal statutes are to be construed strictly' " and that one " 'is not to be subjected to a penalty unless the words of the statute plainly impose it.' " *Acker, supra,* 361 U.S. at 91,

80 S.Ct. at 147 (citations omitted). Indeed, Willard likens the regulation here to the one struck down in *Acker,* which equated a failure to file a timely declaration of estimated income tax with filing a declaration estimating no tax at all, thus exposing the taxpayer to an added penalty for substantial underestimation. The Court found the regulation to be " 'no more than an attempted addition to the statute of something which is not there.' " *Id.* at 93–94, 80 S.Ct. at 148 (citation omitted).

*Acker* is beside the point and Willard's argument fails for the reason we have already stated. D.C.Code § 47–813(f), as reasonably interpreted by the Department, does not invest the owner of mixed use property with an unqualified right to apportionment, but one dependent on compliance with the information and timing requirements the Mayor is authorized to impose. The loss of mixed use treatment for failure to meet these requirements is not penal or punitive, but is the permissible effect of failure to assist in the process of achieving an accurate and current apportionment.

■ A regulation providing that failure to meet a time limit will result in the loss of benefits does not thereby impose a "penalty." This court, for example, conditions the right to an appeal on the timely filing of a notice of appeal. D.C.App. R. 4, 15. As another example, the District cites the provision of Rule 36 of the Superior Court Rules of Civil Procedure that if a litigant has not responded to a request for admissions within thirty days, the matter is admitted and "conclusively established." *See also First Interstate Credit Alliance, Inc. v. District of Columbia,* 604

---

10. Thus, for example, while both § 47–1007 and § 47–850(e) specify the date by which the annual report is to be filed, § 47–813(f) leaves it to the Mayor to prescribe the "time and ... form" of submission.

11. *State of Washington ex rel. Public Disclosure Comm'n v. Rains,* 87 Wash.2d 626, 555 P.2d 1368 (1976) (en banc), on which Willard relies, differs markedly from this case in that, while there the statute itself imposed a reporting requirement, the only authority delegated to the administering agency was "general rulemaking powers" (akin to the general delegation in D.C.Code § 47–814) which did "not extend to setting time limits for [the required] report-

ing...." *Id.,* 555 P.2d at 1372. Section 47–813(f), as we have seen, entrusts the fashioning of the apportionment method to the Mayor and allows him specifically to prescribe the time for submission of required information.

12. "Except as specifically provided in this chapter, or in other provisions of law applicable to the District of Columbia, the Council may by regulation establish penalties for violations of any provisions of this chapter, including any regulation issued pursuant to this chapter. Such penalties may not exceed imprisonment for longer than 1 year, or a fine not to exceed $10,000, or both, for each offense." D.C.Code § 47–861.

**1244** ■

A.2d 10 (D.C.1992) (construing D.C.Code § 47–3303; taxpayer's failure to pay taxes and interest on time deprives Superior Court of jurisdiction to hear taxpayer appeal). Consequences of this sort may be harsh, but the regulations do not thereby establish penalties. Had 9 DCMR § 327.4 imposed, say, a surcharge of 25% of the real property tax owed for failure to submit the mixed use information, we might well have a different issue.[13] But the fact that the regulation (operating just as do the statutory exempt property and homestead exemption reporting requirements) simply removes the availability of a tax benefit for the year in question suggests that its purpose is a very different one than to punish or penalize.

■■■ In *L.P. Steuart & Bro., Inc. v. Bowles,* 78 U.S.App.D.C. 350, 140 F.2d 703, *aff'd,* 322 U.S. 398, 64 S.Ct. 1097, 88 L.Ed. 1350 (1944), the court stated:

> A penalty is a punishment, an injury inflicted for punitive purposes. Appellant's suspension [from wartime eligibility to transfer a particular commodity] is undoubtedly an injury, but it is not imposed for punitive purposes.

*Id.* at 351, 140 F.2d at 704.[14] So too, the purpose of 9 DCMR § 327.4 is not to penalize but instead—consistent with the evident purpose of § 47–813(f)(2)—to insure that the Department has reliable, current information about the uses of property to assist in apportionment. If the information is not provided before the beginning of the tax year, the Department reasonably presumes that commercial property is being put to its most intensive use, and that the property owner—the person with the most incentive to seek more favorable tax treatment—has no evidence to the contrary. The regulation thus serves the valid purpose of making the operation of the real property tax system workable without imposing an undue burden on the tax collectors. (Even then, taxpayers may ask for extensions of time, 9 DCMR § 329.7, and may be excused from the duty to submit information when their failures are "due to reasonable cause and ... not due to simple neglect." *Id.* § 327.6.)

Finally, we need not consider whether Willard's default in filing, and the resultant reclassification of its property for the tax year 1990, would amount to a forfeiture or punishment if the tax it ended up paying were grossly disproportionate to the actual use of the property. *Cf. Beard v. Goodyear Tire & Rubber Co.,* 587 A.2d 195, 203 (D.C.1991) (forfeiture may arise where sanctions are "disproportionate to the violations or to the damage done"). *See also City of Anchorage v. Thomas,* 624 P.2d 271 (1981). Because of its failure to submit timely information that would have allowed the property to receive a more favorable classification, Willard's 1990 tax bill was approximately 5.2% higher than if it had filed by June 1 ($2.22 million rather than $2.11 million). Given the important purpose served by the regulation, this was not excessive and well short of treatment of the kind that courts have considered penal or a forfeiture.

## IV.

In sum, as applied to the commercial property in question here, we hold that 9 DCMR § 327.4 represents a reasonable interpretation of the authority delegated to the Mayor by D.C.Code § 47–813(f) to require submission of taxpayer information which the Mayor deems necessary to accurate apportionment of mixed use property. We therefore reverse the contrary determination of the trial court.

*So ordered.*

---

**13.** The legislature did just that in 1990 in connection with the new Class Five unoccupied property, by providing that failure of the owner of property that has become unoccupied to notify the Mayor of that fact "shall subject the owner to a penalty equal to 25% of the real property tax owed for the tax year." D.C.Code § 47–813(d–1)(5) (Supp.1994).

**14.** *See also United States v. Lovett,* 328 U.S. 303, 324, 66 S.Ct. 1073, 1083, 90 L.Ed. 1252 (1946) (Frankfurter, J., concurring) ("The fact that harm is inflicted by governmental authority does not make it punishment. Figuratively speaking all discomforting action may be deemed punishment because it deprives of what otherwise would be enjoyed. But there may be reasons other than punitive for such deprivation.").